West Allis Foundry Company, Plaintiff in error, vs. The State, Defendant in error.

*December 15, 1924—February 10, 1925.*

*Master and servant: Labor advertisements: When strike exists: Question of fact: Employer's business not materially affected: Criminal law: Definiteness of charge.*

1. In a prosecution under sec. 103.43, Stats., for a false advertisement for labor without stating in such advertisement that a strike existed, the state must prove that at the time of advertisement there was an actual existing strike in defendant's shop.  p. 28.

2. When by concerted action a number of employees quit work because of a proposed cut in wages, they entered upon a lawful strike as the term is understood and declared, such cut in wages being a grievance justifying their action.  p. 28.

3. Whether a strike actually exists within the meaning of sec. 103.43, Stats., is a question of fact to be determined in proper judicial proceedings.  p. 29.

4. A person charged with crime has the constitutional right to know the nature of the offense with which he is charged.  p. 32.

5. Where an employer's business is not materially affected by the concerted withdrawal of employees, and there are no reasonable grounds for believing that their continued withdrawal will materially affect his business, the employer is lawfully justified in considering that a strike does not exist within the meaning of sec. 103.43, Stats.  p. 33.

6. The evidence is *held* to justify an employer in believing that a strike of employees was ended at the time of its advertisement for labor, notwithstanding picketing still continued.  p. 34.

Crownhart, J., dissents.

Error to review a judgment of the municipal court of Milwaukee county: A. C. Backus, Judge. *Reversed.*

The writ was sued out to review a conviction on an information charging false advertisement for labor on February 27, 1924.

The case was tried without a jury, and there was no material dispute as to the facts, which are substantially:

Plaintiff in error, hereinafter called the company, ran a foundry at West Allis in said county with a normal force

of about thirty-five including core-makers and moulders. It had no contracts with any labor unions regarding employment.

October 8, 1923, notice was given to the entire force of a proposed uniform cut of five cents per hour in their wages. About nine members of labor union Local 125 were then employed as core-makers and moulders. Such union was a member of the International Moulders Union, with headquarters at Cincinnati, and which is a member of the American Federation of Labor.

On such notice of the proposed cut, John and Caspar Weinhoff, members of said local union, and one Bohl, similarly employed but not a member, quit and did not return. The local union officers being informed of the matter and of the quitting by the Weinhoffs sent two men to take their places.

October 12th S. W. Taylor, representative of the International Moulders Union, called on the company regarding such proposed cut so far as the moulders and core-makers were concerned. On the same day the matter was acted upon in the local union, and by the required vote under their by-laws a strike was voted.

October 17th Taylor applied to the International Moulders Union, according to their regulations, to sanction such strike, and received such sanction by telegram on October 20th.

October 22d Taylor again visited the company and suggested a compromise which was refused. Thereupon, on direction by Taylor and the secretary of Local 125 who had accompanied him, one Zuelke, five more members and two apprentices belonging to the union and two non-members then employed as core-makers or moulders, ceased work and none thereafter returned.

Immediately picketing commenced and was carried on by groups of strikers who were members of the union, giving notice to those approaching the shop that there was a strike on and persuading men seeking employment to remain away.

The men so picketing were paid out of the funds of the local union and the International Union. From time to time some of such men obtained employment elsewhere and thereupon the aforesaid allowance to them ceased. On February 27, 1924, only said Zuelke of the men who quit October 22d was so picketing and receiving such pay or benefit. The two Weinhoffs were also picketing.

Within a few days after October 22d the places of the men who had then left were filled by others and they in turn by still others.

On February 27th there were employed by the company eleven moulders and five core-makers, being about thirty-three and one third per cent. more than had been employed at such labor on October 22d, such new men being all residents of Milwaukee or West Allis. The output and general force had increased and the production was normal, the production of good casting for the several months being as follows:

|                    |    |       |
|--------------------|----|-------|
| September, 1923    | 58 | tons. |
| October, 1923      | 31 | "     |
| November, 1923     | 38 | "     |
| December, 1923     | 43 | "     |
| January, 1924      | 68 | "     |
| February, 1924     | 72 | "     |
| March, 1924        | 78 | "     |
| April, 1924        | 48 | "     |

Both Local 125 and the International continuously from October 22d to the time of the trial asserted that the strike was still in existence, publishing a statement to that effect in their monthly journals and quarterly circular letters. After such advertisement the said Zuelke as such picket interviewed a number of men approaching with the idea of obtaining employment and induced them to remain away.

The plaintiff in error was adjudged guilty May 8, 1924, and fined, and to review such judgment has obtained this writ of error.

West Allis Foundry Co. v. State, 186 Wis. 24.

For the plaintiff in error there was a brief by *Lamfrom & Tighe,* attorneys, and *Leon B. Lamfrom* and *Carl B. Rix,* of counsel, all of Milwaukee, and oral argument by *Mr. Lamfrom.*

For the defendant in error there was a brief by the *Attorney General, Eugene Wengert,* district attorney of Milwaukee county, *George B. Skogmo,* special assistant district attorney, and *C. Stanley Perry,* assistant district attorney; and the cause was argued orally by *Mr. Skogmo* and *Mr. Perry.*

*Padway, Skolnik & Winnecour,* attorneys, and *Joseph A. Padway,* of counsel, all of Milwaukee, as *amici curiæ,* on behalf of the Wisconsin State Federation of Labor and another.

ESCHWEILER, J.   The information charged plaintiff in error with having on February 27, 1924, unlawfully attempted to influence, induce, persuade, and engage workmen to change from one place of employment to another in this state through and by means of false advertisements in this: that it did publish in a newspaper published in the city of Milwaukee, said county, the following advertisement: "Moulders—Wanted for floor work.  West Allis Foundry Company, 75th and Elm Streets," and further charging that the said advertisement then and there failed to state that there was a strike at said place of business and that such strike actually existed at such place.

This prosecution is brought under what is now sec. 103.43, having been sec. 1729*p*—1, Stats. 1921, and the language of that statute, so far as here involved, makes it unlawful to induce employees to engage in service by false advertisement through failure to state in any such advertisement "that there is a strike or lockout at the place of the proposed employment, when in fact such strike or lockout then actually exists in such employment at such place."

This being a criminal prosecution, it was necessary for the State to prove that at the time of the advertisement by the company there was then at its shop a strike actually existing. If there was, it is conceded that the judgment should be affirmed; if there was not, it must be reversed.

The validity of this statute has been upheld in *Biersach & Neidermeyer Co. v. State,* 177 Wis. 388, 188 N. W. 650, and its general purpose declared to be within proper public policy to protect the public interests and those seeking employment, citing with approval the same view expressed as to the similar statute in Massachusetts in *Comm. v. Libbey,* 216 Mass. 356, 103 N. E. 923.

There can be no question but that when, by concerted action, a number of the company's employees quit work on October 22d because of the proposed cut in wages, they then entered upon a lawful strike as such term is understood and declared. *Walter W. Oeflein, Inc. v. State,* 177 Wis. 394, 399, 188 N. W. 633.

The proposed general cut in wages was such a grievance as must exist in order to make concerted withdrawal a justifiable strike. That there must exist a grievance as a basis is unquestioned and is so stated by such a leader of labor unionism as the late Mr. Gompers in his work "Labor and the Common Welfare" published in 1919, at page 75, in giving the union labor definition as being such "when directed against an employer with whom the striking workmen have a direct dispute with regard to wages or conditions of labor for the purpose of obtaining a betterment of these conditions," and as testified to in the court below by Mr. Taylor.

The present recognized definition of "strike" as it is used in the industrial world, and the present-day recognition of the legality of a combination of employees to compel compliance with their demands by an employer against his wishes as distinguished from concerted action to force or compel another to do an act against his will, which latter,

in many instances, is still unlawful as actionable conspiracy, and the consequent overturning of the old common-law doctrine which made such combinations by workmen unlawful, has been effected largely by the decisions of courts rather than by action of legislatures, as is so clearly pointed out by Mr. Justice BRANDEIS in his dissent, with which Mr. Justice HOLMES and Mr. Justice CLARKE concurred, in the case of *Duplex P. P. Co. v. Deering,* 254 U. S. 443 (41 Sup. Ct. 172), where he said at p. 481: "The change in the law by which strikes once illegal and even criminal are now recognized as lawful was effected in America largely without the intervention of legislation." He follows this with numerous citations showing the gradual steps by which courts reversed the old common-law rules.

All the recognized definitions of an industrial strike, however, confine it to the concerted action by the employees of the particular employer against whom it is aimed, that is, between the individuals who are under present contract of employment with a particular employer and him, and to no one outside of such class. In determining the particular question here it cannot therefore be regarded as a dispute between the local union, which has no contract with the company, but between the withdrawing employees and the company alone; no question being here raised but that the local and international unions as such may, within lawful limits, lend aid and assistance to their members who are, as employees for the company, engaged in the strike.

The public policy of this state as expressed by its legislature has clearly left the determination of the question as to whether or not a strike actually exists at a given time between the withdrawing employees and the employer to be determined as a simple question of fact before judicial tribunals in proper proceedings such as are involved in this case. Such a question of course cannot be left to either party in such a controversy to be determined by their own declaration as to its existence or non-existence.

The various statutes of all the other states which have enacted legislation on this subject all contain substantially the same language as does ours, viz. "actually exists," and in none of them so far found, except as hereinafter mentioned, is any legislative attempt made to more particularly or precisely fix a criterion for determining when or when not a strike actually exists.

An examination of the various bulletins issued by the United States Bureau of Labor and referred to in the latest one accessible, covering the labor legislation of 1922, No. 330, under the heading "Strike, notice of in advertisements, etc.," in the cumulative index, page 95, discloses that instead of our phrase "actually exists," *supra,* the word "existence" is used in California, Maine, Massachusetts, New Hampshire, and Porto Rico, the latter by law adopted in 1917; others use the phrase "then actually exists," viz. Colorado, Maine, Oklahoma, Oregon, and Tennessee, the latter being apparently one of the first of the states to adopt such legislation and that in 1901. Minnesota in 1923 added to its law as to false statements in labor employment a provision almost identical with our law and using the phrase "actually exists." So that during all these years that the matter has been considered for legislation no substantial change has been made in the phraseology.

Our own law on the subject first appeared as sec. 1729*o* by ch. 364, Laws of 1911, and that, as first proposed, made it a felony for any firm, person, or corporation to advertise *outside* of this state for the purpose of securing employees during the continuance of any strike, lockout, or labor dispute unless stating that there is such a strike going on; but an amendment was adopted changing it to a misdemeanor, and as finally passed it covered the general subject only of false representations in the employment of labor, including the condition that no false statement shall be made concerning "the *existence or non-existence* of any strike, lockout, or other labor dispute."

In 1915, by ch. 457, this sec. 1729*o* was entirely repealed and a new section, 1729*p*—1, created.   It thereby added to the subject matter of fraudulent advertisements as contained in the first statute a provision giving a cause of action for damages arising out of any such false advertisement; the original bill as proposed in 1915 providing, as to such newly created cause of action, that application might be made by any person or "any central labor organization or recognized labor union" on behalf of such person, alleging facts showing a right of action, to the industrial commission, and providing for a hearing upon notice, findings of fact by the commission, and that such findings should be held *prima facie* true in any action brought by such person.   In its final passage, however, this provision was entirely omitted.   The legislative records, both as to the law of 1911 and 1915, show no attempt to make more explicit or definite the language concerning or to establish any particular standard whereby to determine whether a strike "actually exists" as found in the present law or as to its "existence or non-existence" as found in the earlier law.

Several states, in making provision for a state board of conciliation or arbitration, give to such body the duty of determining when their functioning as such shall cease and that to be when they find that the business of the employer in respect to which the strike or labor trouble occurred "is being carried on in the normal and usual manner and to the normal and usual extent."   This particular language in the Massachusetts statute of 1910 was passed upon in the case of *Comm. v. Libbey*, 216 Mass. 356, 360, 103 N. E. 923, *supra*, and to the effect that such particular method was a proper one but not exclusive.

A statute similar to that of Massachusetts and using the words last above quoted was adopted in Maine and New Hampshire in 1913.

Other states have provided for the filing, on behalf of either employees or employers, their respective statements

as to the existence or non-existence of a strike at a particular place of employment, which information shall, under certain conditions, be given to all who seek employment at public employment bureaus. It was so provided in New York in 1914, Pennsylvania in 1915, South Dakota in 1920, and North Dakota in 1921.

An inspection, therefore, of the legislative declarations in all parts of this country and over a period of more than twenty years shows that in no instance a labor union as such, with no contract by it with a particular employer, has been recognized as having a right to control or determine, as though a party to such controversy concerning grievances between employer and employees, such question as here presented. Further, that in all these instances of labor legislation the only attempt to declare what shall be a standard in determining such question is that expressed in the above quoted phrase from the Massachusetts laws and which in effect is, that so far as the interference by the state is concerned for the interests of the general public and those seeking employment, such state interference or control is deemed to be properly ended when the withdrawal of the striking employees no longer prevents the employer carrying on his business in the normal and usual manner and to the normal and usual extent. Such suggested test was recognized as proper in the following cases: *Moore D. F. Co. v. McCarthy,* 243 Mass. 554, 562, 137 N. E. 919; *M. Steinert & Sons Co. v. Tagen,* 207 Mass. 394, 397, 93 N. E. 584; *Dail-Overland Co. v. Willys-Overland, Inc.* 263 Fed. 171, 188, 190, and the same case in the court of appeals, 274 Fed. 56, 65. We do not, however, care to adopt such language, framed as it was in a statute with a different purpose than the one here before us.

That a person charged with a criminal offense is entitled under our constitution to know in advance the nature of the offense charged is firmly established (*Roth v. State,* 180 Wis. 573, 193 N. W. 650; *In re Carlson,* 176 Wis. 538, 547,

186 N. W. 722), and such information was given the defendant here; but to determine when a given state of facts as known to one so charged brings him within or without many particular statutes is much more difficult. Such troublesome field of definition was discussed by Mr. Chief Justice VINJE in *Mulkern v. State,* 176 Wis. 490, 187 N. W. 190, in an opinion upholding a conviction under our statute prohibiting the driving of an automobile at a rate of speed greater than was reasonable and proper. On the other hand, in *U. S. v. L. Cohen G. Co.* 255 U. S. 81, 89, 41 Sup. Ct. 298, it was held that a portion of the Lever Act of 1919 was void because too indefinite to permit proper carrying out by court and jury which made it unlawful "for any person wilfully . . . to make any unjust or unreasonable rate or charge in handling or dealing in or with necessaries."

In the present case, there being no given legislative standard in the statute here present or in any other of our state laws, including sec. 133.07, cited to our attention and which provides for the organization of labor unions and regulating injunctions in labor disputes, we shall hold that the defendant might, at the time of the advertisement, be lawfully justified in considering that a strike shall be deemed at an end when conditions are such that the business of the employer is not materially affected by it, and there are no reasonable grounds for believing that a continuance thereof will materially affect his business.

Under the undisputed facts in this case, the employees withdrawing on October 22d were lawfully exercising a right, by such concerted withdrawal, to lessen production, delay or impair the employer's work, increase the costs thereof, or cause material interference with his carrying on of contracts he may have had with others, in order to thereby redress their grievance. It is the concerted withdrawal, however, of such employees that makes the strike. Picketing and persuading others to keep away from such employment are but incidents of and not the strike itself. At the time

of the advertisement in February, 1924, the force or eco-
nomic pressure that had been exerted on the employer by
such withdrawal was no longer in existence. At such time
the employer had more than a normal and usual force of
men and more than the normal and usual force of core-
makers and moulders at work. There is no testimony what-
soever to indicate that the employees who were then doing
the work that had been done by those who withdrew in
October were what are designated as strike-breakers or
employed solely or principally for the purpose of thwarting
the purpose of the striking employees, but were residents
of Milwaukee county or other than *bona fide* employees.
The production obtained as a result of the work being then
done by such in the factory was in fact increasing its ca-
pacity. Clearly, the conditions in defendant's business were
then such that it was not materially affected by the strike,
and there were no reasonable grounds for believing that a
continuance thereof would materially affect defendant's
business.

We are compelled, therefore, to come to the conclusion
that at the time charged in the information there was not
a strike actually existing, and that the conviction cannot be
sustained.

*By the Court.*—Judgment reversed, with directions . to
dismiss.

CROWNHART, J. (*dissenting*). This was a criminal prose-
cution of the plaintiff in error, herein called the defendant,
on a charge of violating sec. 1729*p*—1, now sec. 103.43, of
the statutes. That section provides that—

"It shall be unlawful to influence, induce, persuade or
attempt to influence, induce, persuade or engage workmen
to change from one place of employment to another in this
state or to accept employment in this state or to bring work-
men of any class or calling into this state to work in any
department of labor in this state, through . . . failure to

state in any advertisement, proposal or contract for the employment that there is a strike or lockout at the place of the proposed employment, when in fact such strike or lockout then actually exists in such employment at such place. . . .''

The case was tried before an able and experienced judge, a jury having been waived, and the defendant was found guilty. From the sentence imposed defendant sued out a writ of error to this court for review.

This court now holds that under the above statute "the defendant might, at the time of the advertisement, be lawfully justified in considering that a strike shall be deemed at an end when conditions are such that the business of the employer is not materially affected by it, and there are no reasonable grounds for believing that a continuance thereof will materially affect his business," and concludes as a matter of law that there was no strike at defendant's plant at the time of the advertisement.

The statute is simple and its purpose is plain. It recognizes an evil growing out of strikes, whereby, through advertisements for help, workmen are induced to come from far and near to apply for work, only to find a strike on at the place of employment, and for that reason they are unable to accept such employment. The workmen so induced are deceived to their injury. They lose time and money through the deceptive advertising. For this reason the legislature passed the statute in question requiring employers to tell the truth in their advertisements. The statute is not harsh. If a strike exists at the plant the advertisement should so state. It merely exemplifies the advertising slogan, "Truth in advertising."

As I view the opinion of the court, it reaches its decision by a process of metaphysical reasoning which is not permissible as applied to the facts of the case. We are called upon to determine whether a strike actually existed at the time the defendant advertised for help. If so, defendant was required to insert that fact in its advertisement. That

question is one of fact to be found from all the circumstances of the situation. Questions of fact are to be determined by the jury, or, when a jury is waived, by the trial court.

To determine the meaning of the statute we must look to the whole and every part thereof in the light of the purposes and objects of the statute to be accomplished. To say that the statute, because it provides a penalty for its violation, must be strictly construed, means no more than that it shall be fairly construed to carry out the legislative intent, if that intent is manifest on the face of the statute.

The purpose of the statute cannot well be in doubt. It is a matter of common knowledge that an advertisement for help, in a paper of general circulation, is calculated and intended to bring workmen from far and near to apply for work. If the conditions surrounding the employment are such that workmen are deceived into losing time and money in seeking employment, and then because of such existing conditions are unable to accept such employment, a deception has been practiced to the injury of the responding workmen. Here the employer did advertise for help in a paper of general circulation, and in response to such advertisement fifteen workmen came to the employer's plant on the 3d day of March, who, upon being notified that there was a strike on at the plant, refused to make application for work. Mr. Charles Zuelke testified:

"Since I have been on picket line, I have interviewed people that were applying for positions there, especially when that 'ad' was in the paper I interviewed fifteen men on the 3d day of March. There were three from Stevens Point, two from Manitowoc, two from Chicago, two from Oshkosh, and one from South Milwaukee, and five I think from down here. I told them a strike was on and they showed me the 'ad' in the paper saying they wanted moulders out there. I showed them the Journal [union paper], and showed them right here that there was a strike on, and told them we were out since the 12th of October, and they says

it is funny they didn't advertise in the paper there was labor trouble.   They went back.   They said they wouldn't go in if there was a strike on."

Now, here are the simple facts, stripped of all legalistic adornment.   Responding to an 'ad' by the defendant, men from Milwaukee, Stevens Point, Manitowoc, Oshkosh, and Chicago traveled long distances to seek employment, who, if they had known the fact of a strike at the plant, would not have incurred the expense nor have taken the time for the purpose.   They had been deceived, and largely because of the very statute under consideration as now construed. They supposed that if a strike existed the fact would have been stated in the 'ad' as prescribed in the statute.   These were tragedies to poor men seeking employment, which the legislature sought to prevent, and such as only poor workmen thus imposed upon can fully appreciate.   This court now holds, by a highly technical construction that will be little understood by men of ordinary intelligence, that the statute does not apply; that in order for workmen to know whether a strike does actually exist at any such place they first must go there and find out for themselves.   All of which shows that the statute does not mean what it was intended to mean, and that it does not prevent the abuses it was intended to prevent.

How is the nullification of legislative intent brought about?   How is this supposedly beneficial statute made an actual instrument of deception and fraud upon these hapless men?   The answer is, this court has given a meaning to the term "strike" contrary to the supposed meaning,— contrary to the true meaning, as I understand the term.   A strike has been variously defined under different conditions. See Words and Phrases.   But nowhere, save in this case, has the term as used in our statute been so defined, so far as I can find.   The term "strike" originated with laboring men.   They have determined by their actions, by custom and practice, what is and what is not a strike.   Courts

should draw their definition of strikes from the actual custom and practice of laboring men engaged in strikes. Now these practices and customs are not in doubt. There is concerted action on the part of employees, sanctioned by their unions, if any, in quitting their employment. This is done to obtain redress of grievances by imposing some pressure upon the employer. This pressure customarily takes on an effort on the part of the employees, acting by themselves or more commonly through their union, of preventing the employer from filling their places or of securing sufficient men to efficiently operate his plant. The methods of accomplishing this object are many. Laboring men are taught by stern necessity to stand together, and that it is dishonorable for a man to accept employment in a plant where his fellows are out on strike. By practice and custom for long among laboring men, the man who takes the place of a striking employee becomes a "scab"—an opprobrious term generally so applied. To prevent others from taking the strikers' places, pickets are stationed near the plant to inform men about to apply for work that a strike is on. This is held to be legal, providing that the number of pickets shall not be so great as to intimidate those desiring to enter the employment from doing so. Other means employed are to carry notices in their craft papers of the strike and to place such employers on the "unfair list." Another method is to create public sentiment against the employer and his unfair methods, if such exist, and thus injure his trade. The men on strike are assisted by their unions by being paid strike benefits. In case of little employment or in "hard times" none of these methods may be immediately effective. Hunger and other distress may drive men to break the rules of the game, but when employment is normal, if the strike is kept up, these men seek more honorable employment, at least less offensive employment.

When a strike ends, in the absence of it being declared off by the men themselves or by their unions, must neces-

sarily depend upon many factors.  I think normal production at the plant has little to do with it.  Normal production may be increased or reduced by things entirely disconnected with the strike.  The real test of a strike must be: Are the usual concomitants of a strike still attached to the situation; are the men still out; are pickets kept up; are the union and union papers still publishing notices of the strike; is pressure still maintained on the employer by which he is burdened financially, or physically and mentally impressed; are men prevented from accepting employment at the plant by reason of the conditions existing with reference thereto; are strike benefits still being paid; is the action of the employees, or the union in their behalf, to maintain the strike, in good faith with some hope of ultimate success?  If any or all of these questions may be answered in the affirmative, there is some evidence of a strike actually existing, and if most of them exist, as they did in this case, then the fact of a strike actually existing is sufficiently established, as the term "strike" is used in the act before us.

If output of the plant is a guide, the largely decreased output for April following would indicate that the strike pressure was effective.  Presumably the defendant was short of help or wanted to increase production.  What happened? Daily production did not increase in March, and fell off sharply in April.  The inference is plain.  The output decreased from seventy-eight tons in March to forty-eight tons in April.  But I do not conceive that production has much to do in determining the ultimate fact.  The pressure may be moral and it may depress the market for defendant's production.  That pressure may not be immediately apparent, and its full effect is likely to be delayed for some time. But in discussing these side issues we should not get away from the main issue.  Was there a strike on at the defendant's plant at the time of the advertisement?  To determine the answer to that question we must look at the situation largely from the standpoint of the strikers.  They make

the strike, not the company.   The company may make a lockout, but it does not make a strike.   When the men cease to strike, cease to do those things which ordinarily accompany a strike, then the strike is over and not till then.

As Mr. Justice BRANDEIS, of the United States supreme court, has clearly pointed out in his dissenting opinion in *Duplex P. P. Co. v. Deering,* 254 U. S. 443 (41 Sup. Ct. 172), at p. 481:

"The change in the law by which strikes once illegal and even criminal are now recognized as lawful was effected in America largely without the intervention of legislation. This reversal of a common-law rule was not due to the rejection by the courts of one principle and the adoption in its stead of another, but *to a better realization of the facts of industrial life.*"

In "Law, Its Origin, Growth and Function," by Mr. James C. Carter, the growth of the common law is most forcibly shown to be a recognition by the courts of the customs of life.   He says:

"Judges are both by appointment and tradition the experts in ascertaining and declaring the customs of life. . . . It is the function of the judges to watchfully observe the developing moral thought, and catch the indications of improvement in customary conduct, and enlarge and refine correspondingly the legal rules.   In this way, step by step, · the great fabrics of common law and equity law have been built up without the aid of legislation and the process is still going on."   Pages 327, 329.

Why, then, should we not recognize the practices and customs of laboring men on strike to determine what is a strike?   The majority opinion ignores these well-known customs of laboring men.   It ignores the facts that constitute a strike, and considers only the effects of a strike on the employer's business.   The effects of a strike are not so easily determined.   But the question here, more material to the issue, is: What was the effect of the strike as con-

ducted, on men who came to apply for work? Were they turned away because of the strike? Did they lose time and money as a result of the failure to disclose the fact of the strike in the advertisement? If so, then the statute plainly was violated in its purpose and spirit.

The majority opinion says:

"All the recognized definitions of an industrial strike, however, confine it to the concerted action by the employees of the particular employer against whom it is aimed, that is, between the individuals who are under present contract of employment with a particular employer and him, and to no one outside of such class. In determining the particular question here it cannot, therefore, be regarded as a dispute between the local union, which has no contract with the company, but between the withdrawing employees and the company alone."

If I understand this statement, I cannot agree as to the definitions of a strike, or if we concede that the definitions are as stated, I cannot concede their correctness. We cannot properly ignore the general practices and customs of laboring men and their unions. By custom, rules, and practice employees rely on their unions as the agency to carry on their fight in case of a strike, and justly so. These labor struggles in modern times resolve themselves into contests of organized workmen on the one hand, and organized capital and employers on the other. The definition cited ignores the facts of industrial life. "In the dark all cats are gray." That is so only because they seem so. In fact, the color does not change with darkness. Nor can we change the relation of unions to their members and employers by ignoring the facts as they really exist and which are of common knowledge. In the modern strike the individual employee is only an atom in a world of matter. He counts for so little that he is hardly heard in the fight. A strike is carried on by local and national unions. Why blink the facts? The immediate contest may seem to be between a

single employer and a few employees, but the principle involved may be nation-wide, with organizations on both sides with nation-wide power engaged directly or indirectly in the battle. A strike without the sanction and assistance of the unions is doomed to disaster from the start.

The fact as to whether a strike actually existed at the time of the advertisement was for the trial judge to find from all the evidence. He found the defendant guilty. I think he could not have done otherwise under the evidence.

For these reasons I respectfully dissent.