James Sarros and Peter G. Liarakos, co-partners, trading under the firm name of "New York Restaurant and Lunch Room",

*vs.*

Sam Nouris, Leon Vouros, Harry Viollis, George Petrochylos; James Zouliwchi, Helen Long, Olive Mull, James Pappageorgieu, Francis Ford, Louis G. Liarakos, Francis Ford, President of Local Union No. 585, Hotel and Restaurant Employees' International Alliance, a voluntary unincorporated association, Louis G. Liarakos, Secretary, Treasurer and Business Representative of Local Union No. 585, Hotel and Restaurant Employees' International Alliance, a voluntary unincorporated association, John C. Saylor and James O'Kane, John C. Saylor, Secretary of Central Labor Union, a voluntary unincorporated association, James O'Kane, President of Central Labor Union, a voluntary unincorporated association.

*New Castle, July* 27, 1927.

*David J. Reinhardt* and *William Prickett*, for complainants.
*Percy Warren Green*, for defendants.

THE CHANCELLOR. The complainants are proprietors of a restaurant known as the New York Restaurant, located at 408 and 410 Market Street, Wilmington, Delaware. They employ thirty-eight tó forty persons in the business, and ordinarily serve more than one thousand people per day. They have invested in their business about $160,000, and prior to the strike hereinafter referred to, their business yielded upwards of $180,000 of gross receipts per year and was steadily increasing in value. Upon the inauguration of the strike and by reason of the things done or procured to be done by the defendants in connection therewith, the gross receipts of the complainants were reduced about $100 per day. That the defendants have caused, as they intended to cause, substantial financial loss to the complainants, is amply shown.

In the spring of 1926 Local Union No. 585 was organized in Wilmington. The complainants as proprietors of the New York Restaurant, together with the proprietors of other restuarants in that city, met with representatives of said union and with a representative of the Department of Labor of the government of the United States for the purpose of discussing hours of labor, scale of wages and working conditions of the employees. An agreement was reached on May 14, 1926, by the parties to the discussion

which is conveniently referred to as the "government agreement." That agreement was in the form of a letter to the Commissioner of Conciliation of the Department of Labor, signed by the restaurant proprietors, among whom were the complainants as operators of the New York Restaurant. It contained the following terms:

"That wages shall be paid semimonthly at the option of the employee.

"That wages shall remain as at present with exception of Lambros Restaurant, which shall be adjusted between the management of Lambros and their employees.

"Ten hours shall constitute a day's work.

"Six days shall constitute a week's work.

"All overtime shall be paid for at the rate of fifty cents per hour. When in excess of seven days work is performed on the seventh day same shall be paid for on the basis of double time for said seventh day.

"It is understood that if employees remain on duty voluntarily in excess of ten hours no allowance shall be made for such overtime, but if requested by the employer then extra time shall be paid on the 'give and take' basis, namely, no pay to be made for less than one-half hour, and for more than one-half hour to be paid for one full hour.

"It was generally agreed that the above would be satisfactory to all present and that the employees would enter into this arrangement in good faith and carry same out fully at all times.

"That while the employers are unwilling, at this time, to enter into any agreement or contractual relations with the union, objection will not be made against affiliation or membership in any union or labor organization, nor will any employee be discharged by reason of their membership in such organization. It is distinctly and expressly understood that if any employee neglects their duty or fails to give proper service and attention to the patrons of our establishments and use their time in the promotion of union activities such action shall be considered just cause for instant discharge without notice or appeal."

While the agreement referred to is called such, yet it avoids, as will be noted, anything in the nature of a recognition by the proprietors of the union as a contracting party. Though not an agreement in point of form, yet it was meant to be one in point of fact between the employers and the employees, was so regarded by everybody in interest and was recognized by the complainants as well as their employees as binding. I therefore shall regard it as did the complainants, as an expression of obligations which were

binding upon them and the faithful keeping of which the employees were entitled to expect.

The complainants contend that they have faithfully kept the terms of that agreement in all respects down at least to the second day of November, when a strike was declared against them, and have continued since that date so to do except in one particular, viz., in the one that engages the proprietors to make no objection against affiliation or membership on the part of the employees in any union or labor organization. Since and during the strike, the complainants admit that they have declined to receive members of Local No. 585 into their employ. If the strike is such as to merit the designation of unlawful, as is contended by the complainants, their refusal to employ union men since its inception and during its continuance is entirely warranted. Whether the strike is a lawful one will be later considered.

The strike was declared on November 2, 1926. The complainants contend that no grievances or disputes as to wages, hours of labor and working conditions existed between them as proprietors on the one side and any of their employees on the other; that the sole object of the strike was to compel the complainants to unionize their business, and was in furtherance of a general conspiracy on the part of the officers and members of the union to compel all restaurant owners and operators of Greek nationality or descent in the city of Wilmington where Greek labor is employed to join said union.

The defendants insist that such was not the purpose of the strike. In their answer and by their evidence they undertake to show that the complainants violated the terms of the so-called government agreement in various particulars. If they are right in this, I take it that a strike whose object was to enforce the promises of the proprietors and all lawful means to make the strike effective would be permissible. *Smith v. Bowen*, 232 *Mass.* 106, 121 *N. E.* 814; *Walton Lunch Co. v. Kearney*, 236 *Mass.* 310, 128 *N. E.* 429.

I turn to the evidence for the purpose of ascertaining whether, or not, this important fact of violation by the complainants of the agreement did exist. This being the thing which is advanced as a justification for the strike, the burden is on the defendants to show

it by a preponderance of the evidence. *N. J. Printing Co. v. Local No.* 26, 95 *N. J. Eq.* 108, 122 *A.* 622, reversed on other grounds in 96 N. J. Eq. 632, 126 *A.* 399, 47 *A. L. R.* 384. The specifications of violation are few. They hinge entirely upon the clause by which the complainants undertake not to discriminate against any employee because of his affiliation with the union. First, it is said that inducements in the way of a bonus were offered by the complainants to prospective employees not to join the union. The evidence by which this charge is supported is flatly contradicted by the complainants. It is confined to a very meagre extent. If it were the policy of the complainants to use a bonus as a means of increasing the salary of a non-union man, it seems to me that the evidence to that effect would be of something more than the isolated case to which it refers, and the existence of which the complainants deny. There certainly was no policy to this effect, nor can I find from the preponderance of the evidence that there was any isolated case of the character described.

The second specification of discrimination is that a member of the union, one Soterapoulos, was discharged because he was a member of the union. That he was discharged is admitted. But such discharge was a purely detached circumstance and is of no significance whatever as showing a breach of the complainants' engagement to make no discrimination against union men. Soterapoulos ought to have been discharged. He himself admits that he had some trouble with customers over the orders given him, made a mistake in checks and on one occasion in an altercation with a patron thumbed his nose at him. Must a restaurateur keep such a man in his employ or suffer the penalties of a strike order? I think not. *In re Higgins,* (*C. C.*) 27 *F.* 443. The government agreement itself recognizes the propriety of dismissing an employee for such conduct.

A third item in the specifications of discrimination against union men consists in the fact that a few of the employees fancied that the greetings which they received from their employers in the morning or through the day were not as pleasant and cordial as they had been before affiliation with the union. The employers testify that they were not aware of being less agreeable than they had been before. One or two of the union employees left their employ-

ment because of this fancied coolness. Others of them, however, much greater in number, remained and say they could see no difference in the manner of their treatment. This ground of complaint is all too fanciful to merit further notice.

Fourth specification—this is that union men were subjected to an enforced vacation of two weeks without pay, and thus discriminated against. The evidence completely disproves this. The complainants did have a policy of requiring their employees to take such vacations by turn. The policy applied during slack times. It has prevailed in the complainants' restaurant ever since they have been in business and years before the union was organized, and the evidence shows that since the union was organized in the spring of 1926 it applied with impartiality to non-union as well as to union employees. No discrimination is therefore shown in this regard.

I listened attentively to the testimony at the lengthy hearings, and I failed to hear anything which even approaches persuasiveness that the complainants in any way failed to scrupulously keep the agreement which they made through the Department of Labor conciliator. They invited their employees to indicate whether payment of wages should be made semi-monthly or not, and paid each person in accordance with his expressed preference. Not a single instance of a dispute over wages, hours of employment or working conditions is shown. That nothing in the way of a serious controversy between the complainants and their employees existed prior to the promulgation of the strike, is shown not alone by the evidence, but would seem to be manifest as well from the fact that in response to the strike call only seven of the thirty-eight to forty employees abandoned their employment.

The entire justification for the strike rests on the alleged acts of discrimination hereinbefore referred to. Upon examination this alleged justification is so devoid of merit, that I cannot escape the conclusion that in some undisclosed motive is to be found the real reason for the strike and the cause of the picketing incidental thereto. If the strike was solely to injure the complainants in their business, it was according to all the authorities illegal, and any picketing or other activites designed to promote it should be en-

joined. I do not impute to the defendants, however, a motive so malicious as to aim solely to do injury to the complainants. They must have had some purpose which in their opinion justified them as a matter of self advancement in inaugurating against the complainants a strike campaign which must necessarily result in their serious pecuniary loss. Unless such a motive is found, the defendants are in the unenviable position of wantonly inflicting injury upon another to his great damage without corresponding benefit to themselves. Refusing to believe under the evidence that the defendants were engaged in such an enterprise as that, I turn to the testimony to see if some explanation for the strike can be found which if true would deprive the conduct of the defendants of that character of wantonness which no one would in the absence of compulsion care to attribute to another.

Such an explanation is to be found in the suggestion that the purpose of the defendants was to force the complainants to recognize the union, a thing which by tacit consent the negotiations under the Department of Labor Commissioner had recognized as unobtainable, and as a corollary to compel the complainants to unionize their restaurant, or, as it was put, to join the union. There was some evidence of negotiations between the complainants and spokesmen for the union before the strike was declared from which such a purpose is strongly indicated. And since the strike was declared, demands by the union have frankly stated that the only way the complainants can now purchase peace is for them to completely unionize their restaurant, employ only union men, discharge all non-striking workers and operate their business under an agreement acceptable to the union officials. I am quite aware that these post-strike demands may be said to have been put forward only for the purposes of trading or, to use a slang expression, dickering for a settlement. Allowing for all the excess of demands that the trading spirit might account for, it yet seems to me that light is thrown by the post-strike negotiations upon the ante-strike ones in such way as to give to the latter an even stronger color of a purpose to thoroughly unionize the New York Restaurant than they might otherwise possess.

Because therefore the ostensible reasons for the strike are so completely unsupported by proof and looking to the only other

evidence which can in any wise disclose a purpose short of pure wantonness or malice, I conclude that the defendants seek by the strike to compel a unionization of the complainants' business. Now, if the point of view of the defendants is such that a strike for such a purpose is lawful, a belief on their part to that effect, while it relieves them of the odium of malicious behavior, cannot of course make their acts lawful.

What is the law touching the lawfulness of a strike whose sole purpose is to accomplish what is familiarly known as the unionization of an employer's business? There is a great abundance of cases which deal with this question. The Supreme Court of the United States in *Hitchman Coal & Coke Co. v. Mitchell*, 245 *U. S.* 229, 38 *S. Ct.* 65, 62 *L. Ed.* 260, *L. R. A.* 1918C. 497, *Ann. Cas.* 1918B, 461, decided in 1917, said that:

"The purpose entertained by defendants to bring about a strike at plaintiff's mine in order to compel plaintiff, through fear of financial loss, to consent to the unionization of the mine as the lesser evil, was an unlawful purpose."

The designation of such a purpose as unlawful appears to be in harmony with the weight of authority. To undertake to review all the cases in this opinion would involve a task which time does not permit me to take. I have examined many of them and find a decided conflict between courts in different jurisdictions as well as between courts in the same jurisdiction. To endeavor to reconcile the conflict in those cases where it is only apparent and to selectively weigh the views in others which are so fundamentally divergent as to admit of no reconciliation is a task which requires more time than is now at my disposal. I must, therefore, content myself with the statement that a recent text-writer has gathered the cases which bear upon the point and announces in substance that the weight of authority favors the view that a strike lacks a legitimate aim which seeks to obtain a so-called closed shop. *Oakes on Organized Labor and Industrial Conflicts*, § 292. The same author in § 295 of his work cites the cases also which hold for and against the proposition that recognition of the union is not a proper subject for industrial disputes.

In the instant case no challenge is made against the right of employees to quit their work for any reasons they may see fit.

The complaint is that the defendants have chosen by a system of picketing to carry on a campaign against the continuance of others at work for the complainants and at the same time to induce the public to boycott the complainants in the conduct of their restaurant business. In so far as the boycott is concerned the campaign has met with a fair degree of success, though with respect to the other object, viz., the inducing of others to avoid employment by the complainants, the strike appears to have been a complete failure. The real object of the strike being as I have said to compel the complainants to unionize their business by subjecting it to control and domination by the labor organization, an object which the law does not recognize as legitimate, the complainants are entitled to protection against the continued picketing of their place of business by the defendants or their agents. If it is lawful for the defendants to destroy a part of the complainants' business by the picketing and its incidental boycott, it would be lawful for them if possible to destroy it in toto. As I read the authorities, their weight is to the effect that such calamitous consequences cannot be visited upon the complainants as punishment for their refusal to surrender the right which is theirs to employ non-union labor if they choose.

This being true, the picketing which has been going on is unlawful, whether peaceful or otherwise. I am not, therefore, called upon to go into the question of whether picketing if peacefully conducted is permissible in labor controversies, for if the object of the picketers is unlawful, picketing of all kinds is likewise so.

Decree for the complainants in accordance with the foregoing, costs on the defendants.