MOTION PICTURE MACHINE PROJECTIONISTS PROTECTIVE UNION, LOCAL NO. 473, INTERNATIONAL ALLIANCE OF THEATRE STATE EMPLOYEES AND MOTION PICTURE MACHINE PROJCTIONISTS OF THE UNITED STATES AND CANADA, an unincorporated association of persons using a common name and not of persons using a common name and not being an ordinary partnership, PHILIP JONES (President of said association), et al.,

Defendants Below, Appelants,

vs.

RIALTO THEATRE COMPANY, a corporation of the State of Delaware,

Complainant Below, Appellee.

*Supreme Court, On Appeal, Jan. 30, 1941.*

348

LAYTON, C. J., and RICHARDS, RODNEY, SPEAKMAN, and TERRY, JJ., sitting.

*H. Albert Young*, (*Joseph A. Padway*, of Washington, D. C., of counsel), for appellants.

*William H. Foulk*, for appellee.

Supreme Court, June Term, 1940.

LAYTON, Chief Justice, delivering the opinion of the court:

The court below thought it unnecessary to decide whether even peaceful picketing is lawful. It was of opinion that the evidence indicated that the four striking employees had found employments elsewhere which would have been permanent save for the unexpected closing of the Arcadia Theatre. For this, and the additional reason that, under all the facts, the defendants had no reason to believe that they could accomplish anything by persuasive methods by continuing the picketing, it was concluded that, in law, the strike was at an end. Quite apart from these considerations, and deemed to be of greater importance, were the facts that there was no contract between the Corporation and the Union, and that no statute or municipal ordinance or regulation had been violated; consequently, the Union could not enforce its own regulations on the Corporation for it was not bound by contract or otherwise to observe them. The conclusion was that the picketing was for an improper purpose, intended for boycott and injury unless the Corporation complied with rules which the Union had no right to impose.

The reasons for disagreement with the conclusions reached by the learned Chancellor will be briefly stated.

The worker has the undoubted right to associate himself with his fellows for the advancement of his interests without interference on the part of the employer; and he has the same right to decline such association without fear of reprisal at the hands of a labor organization. In the absence of contractual obligation employees may lawfully quit work singly, collectively, or as an organization, for any reason or for no reason; and, on the other hand, even by those decisions which support to the full the advanced claims of labor, it is admitted that the employer may hire and discharge workmen when and as he chooses, may employ only non-union labor, or, by proper persuasion, may induce union members to resign from their organizations. *Ex-*

*change Bakery & Restaurant, Inc., v. Rifkin,* 245 *N. Y.* 260, 157 *N. E.* 130. Having due regard for the preservation of contractual obligations and the repression of illegal combinations and conspiracies, the right to sever relations is mutual.

The labor organization is an embodiment of the axiom that in unity there is strength. The labor union is a lawful organization. No court now holds to the contrary. How far such an organization may go in its effort to promote the interests of its members without unlawfully trespassing on the rights of others is a question that gives rise to opinions as widely divergent as human philosophies may differ. Clashes of interest in the struggle for individual or class betterment are inevitable. Competition in any endeavor may bring advantage to some, injury to others. Damage for which the law affords no remedy, or an inadequate remedy, may be the consequence, for, clearly, human activities may not be so curtailed or circumscribed as to prevent one, either alone or in concert with others, from doing anything at all to better his condition in life. Obviously there must be limitations. In a complex world the public welfare demands that rights and interests be defined, reconciled and adjusted.

The most important and effective means adopted by labor organizations for the accomplishment of their objects is a concerted cessation from work by members of such an organization at its command. The early conception of a strike as a conspiracy to be dealt with as such, either in a criminal or civil action, has given place to its acceptance as an indispensable right of labor in its struggle with capital. Liability for the resulting intentional harm is denied if the concerted action is justified; and for this change of philosophy, courts, not legislatures, are the more responsible.

Picketing the place of business of an employer, either for the purpose of inducing employees to quit their work,

or to refuse employment thereat, or to persuade customers no longer to bestow their patronage, is one of the measures usually adopted in a strike. In some jurisdictions, steadily dwindling in number, picketing is not recognized as a lawful activity. Vindictiveness and an intent to injure are presumed; and it has been said that the term itself is one of warfare, and that there can be no such thing as peaceful picketing, any more can there be, peaceful mobbing or lawful lynching. The basis of this view is that picketing, however peaceably conducted, is not an argument directed to the intellect, but is a form of coercion deliberately adopted to injure the employer by arousing in the mind of the employee or worker fear of reprisal, and, with respect to the patronizing public, to make avail of the ordinary human instinct to avoid trouble or disagreeable situations, to the injury of the employer. This view is, of course, supported in fact by the many instances of turbulence and violence that have accompanied strikes and picketing. But the issue is essentially a practical one. Picketing is not to be categorically condemned because injury may, and probably will, result. Material injury frequently is the consequence of ordinary business competition in its various forms. Picketing is not inevitably a species of intimidation; and whatever may be said of the method as being an argument calculated to produce intellectual conviction, it is undoubtedly a means of publicizing grievances, and for the enlistment of public support. From such publication discussion and inquiry may be incited; the merit or demerit of the alleged grievance may be exposed.

Dependent upon the existence of a lawful strike resulting from a *bona fide* labor dispute over wages, hours or conditions of work, picketing as a means of informing workers and the public of the existence of such dispute and for inspiring their support, is lawful if conducted without threats, violence, molestation or the circulation of false or misleading representations by a reasonable number of persons whose interest in the controversy is not too remote.

The position of the Union is that there was in existence an honest dispute over conditions of labor and a lawful strike of its members as a consequence. It first contends that compliance with its requirement, that two operators be maintained in the projection booth at all times, would tend to diminish the fire and health hazards which attend the operation of moving picture machines. Emphasis is laid on the hazard of fire. This assertion of justification might well be denied on the ground that it is not supported by the evidence when considered as a whole; but of greater importance is the fact that there was no statute or municipal ordinance or regulation which required the constant presence of two operators in the projection booth in the interest of the public safety. The state, either directly or through its governmental agencies, is the judge of what is necessary, as a matter of law, for the protection of its people; and no organization can assume to impose such a regulation on others under the pretense of promoting the public safety. Acceptance of this theory would be to recognize the existence of an *imperium in imperio;* it would mark the beginning of the end of democratic processes.

The second reason offered in justification of the Union's requirement is that it prevents the employment of projectionists at menial tasks and in work not in keeping with the dignity of a skilled trade and the responsibilities incident to it. The argument may, of course, be made that the work of a projectionist is not to be regarded as so highly skilled that the imposition of other tasks ought justly to be considered as transgressive of the dignity of a skilled worker. It is true that no apprenticeship is required to qualify one as a projectionist, and from the evidence it seems that an apt person may acquire the necessary skill and technique in a short time. See opinion of Graves, J., in *Hughes v. Kansas City M. P. M. O. Local,* 282 *Mo.* 304, 221 *S. W.* 95. But the length of time that may be required to prepare one for certain work is not the sole test. Skill in any trade is simply knowledge of the art coupled with profi-

ciency. In *United Chain Theatres, Inc., v. Philadelphia M. P. M. O. Union,* (*D. C.*) 50 *F.* 2d 189, it was said that the work of a projectionist called for a considerable amount of training and skill. Courts should be slow to discriminate too nicely between skilled and unskilled employments; and we have no reason doubt that the work of a projectionist does demand a measure of training, experience and skill. Properly the work should be classed as skilled labor.

Manifestly, the approach of the Union's rule to the contention as it was advanced was oblique. The straight course would have been a regulation prohibiting directly the employment of projectionists as ushers, ticket takers, or in other incongruous work. But as a practical matter the form of approach means little. The purpose of the rule is the important thing to consider; and that purpose, for the accomplishment of which the rule, in part at least, was enacted, may not be ignored. The Union's requirement, considered broadly, is to be regarded as a legitimate means of bettering working conditions in the particular branch of the moving picture industry. There is nothing in the record to suggest that the Union was not acting in good faith in pressing its demand. Pride in one's calling is something to be encouraged. A *bone fide* labor dispute existed. There was justification for the concerted action. The strike was lawful.

The striking employees were members of the Union; they undoubtedly quit their work. They testified, in effect, that they did not quit permanently; that their employments elsewhere were only temporary; that they were ready and willing to return to the Corporation's service upon the adjustment of the dispute; and it may be said that, ordinarily, a strike is not intended by those engaged in it to be a complete severance of the employer-employee relation, but only a means of enforcing compliance with some demand made on the employer. On the other hand, it seems clear that the Corporation hired other workmen in their stead, not temporarily but permanently; that the new employees

proved competent to do the work for which they were hired; and, as has already been suggested, when one, many or all of the employees quit work, the places thus made vacant no longer belong to them, but to those who have been hired in their stead. In this sense the striking employees, by their own act, became strangers to the business.

From the Corporation's viewpoint, the severance of relations was complete and permanent; and, there being no members of the Union in its employment when the strike was begun, it contends that the picketing was conducted by strangers to the enterprise, and, perforce, unlawful. Undoubtedly, there is strong authority for the view that strangers to the business have no legitimate grievance to air, and that picketing by strangers is outside the pale of lawful picketing no matter how peacefully conducted. In an effort to find some theory by which rights, apparently conflicting, may be reconciled, some courts have held the right to strike and to picket for justifiable cause to be an implied term of the hiring; other authorities conclude that the employer-employee relationship during a lawful strike is not completely severed but is merely in suspension. Practically, the question is one of interest. It is quite true that picketers may have no legitimate link or tie with the business picketed, either because of want of affinity or homology, or because of mere distance from it. In a word, the interest of the picketers may be so remote that it is apparent that they have nothing except abstract unfairness or injustice to publicize. In such case picketing may well be said to be unlawful. But the situation here is not that. The Union was local and small. Its membership was barely sufficient to supply motion picture theatres of the locality with projectionists. There is no evidence that experienced projectionists were readily obtainable. Each of the Union's members was a potential employee of the business. The interest of the striking employees, as well as that of the Union, was not indirect and remote, but closely related and connected.

The picketers were not mere strangers. See *United Chain Theatres, Inc., v. Philadelphia M. P. M. O. Union, supra.*

When a strike is at an end as a matter of law and the right to picket has ceased to exist, are questions upon which conflicting views have been expressed. In *Exchange Bakery & Restaurant v. Rifkin, supra,* it was observed that picketing without a strike is no more unlawful than a strike without picketing. In the *Restatement of the Law of Torts,* § 776, it is said that the strike continues so long as the workers have not abandoned it by taking permanent employment elsewhere or otherwise, even though the employer has filled their places and is operating at normal capacity. Other courts have likened a strike and its concomitant, picketing, to the principle governing a blockade in war; to be lawful it must be effective. It is reasoned that if the employer is unable to obtain the services of a sufficient number of competent workmen to operate his business, or can obtain them only at an unusual or exorbitant wage, or employs them only temporarily and for the purpose of disrupting the strike, or if he is not able by reason of the pressure to carry on his business in a normal manner, the effectiveness of the strike has been demonstrated. It exists as a fact. But the strike may not prove effective. The demands of the strikers may not appeal to the reason either of the workmen in the trade or the patronizing public. The employer may be able to employ at a usual wage a sufficient number of qualified workmen. The public may continue, as theretofore, to bestow its patronage. The strike and the picketing may fail to exert economic pressure; and the facts and circumstances may show that there is no reasonable ground for belief that the purpose for which the strike was called will be accomplished. Consequently, the strike, in contemplation of law, is at an end; and the picketing loses its lawful character and becomes an annoyance and nuisance which, in the interests of the general public, of workmen willing to work, and of the employer whose rights are not unnecessarily to be interfered with, ought no longer to be

tolerated. See *Quinlivan, et al., v. Dail-Overland Co.,* (6 *Cir.*) 274 *F.* 56; *Samuel Hertzig Corp. v. Gibbs,* 295 *Mass.* 229, 3 *N. E.* 2d 831; *Mode Novelty Co. v. Taylor,* 122 *N. J. Eq.* 593, 195 *A.* 819.

In *West Allis Foundry Co. v. State,* 186 *Wis.* 24, 202 *N. W.* 302, 306, these factors were embraced in this language:

"* * * A strike shall be deemed at an end when conditions are such that the business of the employer is not materially affected by it, and there are no reasonable grounds for believing that a continuance thereof will materially affect his business."

The dissenting opinion in the case cited took the view that the practice and customs of workers on strike are of greater significance than the fact that the employer is able to maintain normal production. In this view the important factors to be considered are the maintenance of pickets, publication of notices of the strike in Union papers, payment of strike benefits, maintenance of pressure by which the employer is burdened financially, or physically or mentally impressed, prevention of men accepting employment of conditions existing at the plant, and good faith on the part of the strikers with reasonable hope of success. In *E. M. Loew's Enterprises, Inc., v. International Alliance of Theatrical Stage Employees, et al.,* 125 *Conn.* 391, 6 *A.* 2d 321, 122 *A. L. R.* 1287, it was said that while the fact that the employer had proved his ability to carry on his business in the usual and normal manner despite the efforts of labor would go far to sustain a finding that there was no longer any reasonable expectation that picketing could accomplish a legitimate purpose, the fact that the employer had been able to obtain a full complement of employees and to operate his plant normally would not, of itself, justify the conclusion that the picketing had become unjustifiable if the employer still continued to suffer seriously from loss of patronage. There is much to be said for the moderation and practical good sense of the view of the Connecticut court. The question is one of fact to be determined by the circum-

stances of the particular case. Realistic considerations are more important than abstract theory. Whether the question be approached from the standpoint of the employer that, despite the efforts of the strikers, he has been able to maintain normal operations, or from the viewpoint of the strikers that they are still seeking by concerted action to return to their work and achieve some or all of their demands, the fact that the employer has suffered a serious loss of patronage as a result of the strike and picketing and will likely continue to do so, is a fact of marked and material significance. From this fact the inference may well be drawn that the grievance publicized by the picketing is one which the public has recognized, and probably will persist in recognizing, as reasonable and just by continuing to withhold its patronage.

The bill of complaint alleged that the Corporation had suffered a substantial loss in its property and business, and would continue to suffer great loss and damage unless the defendants were enjoined. From its own testimony it was shown that the small theatre of less than five hundred seating capacity suffered a loss of attendance of more than nine thousand in the sixty-four days of 1939 as compared with the same period in 1938. It is true that, from the same testimony, other factors contributed to the loss of patronage. But the effect of the testimony of the part owner and manager of the theatre was that about two-thirds of the loss of patronage was occasioned by the picketing. The witness had been in the moving picture business for many years. His testimony cannot be put aside as mere conjecture. It is rather to be accepted as the opinion of an expert based upon exceptional and intimate knowledge of the business in general and of the particular theatre. If thirty cents be accepted as an average price of admission, a simple calculation will reveal an important drop in the revenues of the theatre, a material loss of income having consideration for the amount of money invested in the business. The allegations of the bill were fully supported by the evidence. Clear-

ly, the Corporation was burdened by a serious loss of patronage resulting from the picketing. For this reason, if for no other, the strike was not, in fact or in law, at an end. The right to picket peacefully and in a reasonable manner continued to exist.

The Corporation also contends that the strike was unlawful for the reason that it was for the purpose of boycott in an endeavor to compel it to unionize its business. *Sarros v. Nouris*, 15 *Del. Ch.* 391, 138 *A.* 607. But, having found that a legitimate dispute with respect to conditions of employment was at issue, this contention must fail.

The decree of the court below is reversed.