## ALCO–ZANDER CO. et al. v. AMALGAMATED CLOTHING WORKERS OF AMERICA et al.

District Court, E. D. Pennsylvania.   October 8, 1929.

No. 5383.

---

George J. Schorr, Harry S. Mesirov, Benjamin M. Golder, and Morris Wolf, all of Philadelphia, Pa., for plaintiffs.

Stanley Folz, of Philadelphia, Pa., for defendants.

KIRKPATRICK, District Judge.   On September 4, 1929, the complainants, manufacturers of men's clothing engaged in business in Philadelphia, filed two bills in equity against the defendants, an unincorporated labor organization of national extent with headquarters in New York, and against certain of its officers and agents, all citizens and residents of the state of New York, praying for injunctions to restrain certain acts of interference with complainants' business, including combining to bring about strikes in the factories of the complainants. In the first bill, No. 5383, June term, 1929, jurisdiction was based upon alleged restraint of interstate competition in violation of the Sherman Act (15 USCA § 1 et seq.). In the second bill, No. 5385, June term, 1929, in which only four of the plaintiffs, all Pennsylvania corporations, joined, and in which the national labor organization was omitted as a defendant, jurisdiction was based upon the diverse citizenship of the parties, and the cause of action arises under the common law. The court directed notice to be given to the defendants so far as possible, and fixed September 6, 1929, for a hearing, at which time

testimony was taken and affidavits filed. Certain of the defendants, including the Amalgamated Clothing Workers of America, the national organization, appeared at the hearing by counsel, but offered no evidence. On September 9, 1929, the court issued temporary restraining orders substantially as prayed for in the bills; and on September 16, 1929, the orders were modified in order to avoid certain misunderstandings as to their scope which appeared to have arisen. Thereafter, on September 20, 1929, the parties stipulated in writing that the temporary restraining orders should without further proceeding be taken and deemed to be preliminary injunction.

Appeals have been taken from these temporary injunctions, and, in view of the importance of the issues involved, this opinion is filed in order that the record may show the reasons which prompted the issuance of the restraining orders. Although the two proceedings are entirely different in theory, it will be convenient to deal with the entire controversy in a single opinion. The facts as developed at the hearing are as follows:

In the garment industry, Philadelphia is a nonunion field. None of the complainants' shops are unionized, and if any of the complainants' employees were members of the Amalgamated Clothing Workers of America prior to June, 1929 (which does not appear), their number was negligible. In the year 1927 the production of the Philadelphia market amounted to approximately $80,000,000 in value, 80 per cent. of which was shipped in interstate commerce. The wages paid in Philadelphia in the same period amounted to over $14,000,000. On the other hand, the garment industry in New York City has been for some time unionized and New York has been recognized as a union market. In 1927, the production in New York amounted to about $360,000,000 and the wages paid were over $50,000,000.

The existence of a large nonunion market so close to the unionized New York market had been for some time a source of anxiety to the Amalgamated and its officers. They believed that, by reason of the more favorable wages and conditions of work which labor in New York had been able to obtain, the New York manufacturers were unable to compete effectively with the Philadelphia market, and they were apprehensive that as a result the industry in New York in time either would be injured and curtailed with consequent unemployment of union workers there, or would be compelled to go back to a nonunion basis with reduced wages to its employees. In point of fact, the production of the New York market had decreased $16,000,000 from 1925 to 1927, while in the same period that of the Philadelphia market had increased $3,000,000, while as early as 1921 strikes had been called in New York to stop New York houses from sending work to Philadelphia to be made up by nonunion labor there. As the official organ published by the Amalgamated stated: "The open shop basis of operation of the clothing industry in Philadelphia is a menace to the standards of clothing labor everywhere, to the industrial three-fourths of the unionized markets." "Philadelphia undersells New York because of its over-worked and under-paid labor. The Amalgamated does not want Philadelphia employers to compete with New York or other employers on an unfair basis because in the final count that kind of manufacturers' competition means competition between the clothing workers of Philadelphia and of New York and of other cities." "It was inconsistent with the Amalgamated policy to permit the Philadelphia clothing market to compete with the other markets with the aid of underpaid labor and artificially maintained divisions in the ranks of labor rather than on the basis of industrial efficiency and managerial and distributive ability." "The open shop in Philadelphia must cease for the Amalgamated is not safe industrially as long as the open shop continues." One of the defendants, head of the Eastern Organization Department of the Amalgamated and in charge of the Philadelphia campaign, declared, "The work in Philadelphia is important because Philadelphia can make a grave-yard of New York." A member of the general executive board of the Amalgamated stated: "Just as the coal miners' union died, not because of Pennsylvania, but because of West Virginia, so is New York dependent on what will happen not in New York but in Philadelphia. It is in Philadelphia that we must first stop reductions. Fifteen thousand tailors there can break New York."

These considerations moved the Amalgamated Clothing Workers of America to undertake a campaign for the unionizing of the Philadelphia market, the avowed purpose of which was to destroy the advantage which Philadelphia manufacturers had over New York and other parts of the country by reason of nonunion hours and wages. In 1922 at the convention of the national body a

resolution authorizing such a campaign was adopted. This resolution recited that, "The fact that Philadelphia is not fully organized places it in severe competition with the organized centers, especially in New York." The campaign then undertaken failed to yield satisfactory results, and at the national convention of the Amalgamated at Cincinnati in 1928, the present campaign was authorized by a resolution which recited that "conditions in the city of New York are going from bad to worse daily," and that "our conditions in New York have been undermined and the industry paralyzed."

The above declarations are a few of many. They leave no doubt whatever that the primary purpose of the campaign for the unionization of the Philadelphia market was the protection of the unionized markets in other states, particularly New York, and that, while the improvement of the condition of the workers in Philadelphia may have been present as a motive, it was at best a secondary and remote one. Using the language of industrial warfare, the move was a piece of major strategy—an offensive undertaken for the purpose of relieving pressure upon other fronts.

The method which the Amalgamated adopted to carry out its purpose was the calling of strikes in the factories of the complainants and others, totally without notice or warning and apparently without previously presenting demands of any kind to the employers. At any rate, it is a fact that in none of the complainants' plants was there any existing dispute between employers and employees as to wages or conditions of work. Contemporaneous with the calling of the strikes, the employees of the factories were invited to join the union. In case of some employees, the invitation preceded the calling of the strikes. In general, quitting work meant joining the union, and vice versa. After a sufficient number of employees had quit to cripple the business and stop production, they would be organized and negotiations would be undertaken with the employer for the recognition of the union. It is not clear whether the agreements to be made with the employers contemplated an immediate readjustment of wages and working conditions, but that such readjustment was the ultimate purpose and was intended to follow soon is beyond question. It is quite likely that, in proceeding in this manner, the union adopted the most effective method to accomplish its purpose. The mere advocacy of union membership among the plaintiff's employees would have been at best a slow pro-

cess and might in the long run have proved futile. This, however, has no bearing upon the lawfulness of the acts. If the primary intent were not so clearly apparent, it might be argued that the calling of strikes was merely an effective means of increasing union membership by a practical demonstration of what could be accomplished; but, in view of the evidence, it is plain that the object of the strikes was to put an end to all production in Philadelphia under nonunion conditions. and only to permit it to be resumed if and when the manufacturers were willing to operate upon an union basis and under union wage scales. Except as a means to the end of compelling the manufacturers to change their methods of operation, the defendants were not seeking to enlarge the union membership. Hitchman Coal Co. v. Mitchell, 245 U. S. at page 256, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461.

Some of the complainants, no doubt sensing the impending attack, presented contracts to their employees, and in most cases these contracts were signed by the great majority of the employees. These contracts provided substantially that if at any time while the employee was in the employ of the plaintiff such employee desired to become a member of the Amalgamated Clothing Workers of America he would, before becoming so connected, withdraw from the plaintiff's employment. In most cases these contracts were made after the Amalgamated had called a strike in the plant of the particular employer in question. In at least one case they were made before. This, however, seems immaterial, since in all cases they were made with employees who were at the time of making them bona fide employed by the complainants.

There is some testimony going to establish threats, intimidation, and acts of violence on the part of organizers of the union directed against employees who refused to strike. In the view taken of this case, however, this evidence is not important, except so far as it is the basis for certain provisions of the restraining order, which provisions are not specifically complained of or resisted by the defendants.

Each of the restraining orders contains a provision restraining the defendant from combining to bring about a strike or strikes in the factories of the complainants. These are the important provisions of the orders and the only ones that require discussion. If they are proper, the other provisions naturally follow and should be sustained. It will be

noted that the orders are broad enough to restrain the defendants from combining to bring about strikes by peaceful persuasion only, and they were so intended to be.

The facts as stated above, together with the provisions of the orders referred to, raise squarely the fundamental issue, namely, the right of a national labor organization, acting through agents who are not employees of the complainants, to bring about strikes in nonunion plants, the primary purpose and object of which is to prevent the shipment of goods produced by nonunion labor to markets of other states where it will by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing fields. The question has two aspects, here presented by the two separate proceedings: First, the rights of the parties without reference to the effect of the federal statutes; and, second, their rights as affected by those statutes.

■■ At common law, to induce third persons to leave an employment is actionable if done maliciously and without justifiable cause, although such persons are free to leave at their own will. Hitchman Coal Co. v. Mitchell, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461; Truax v. Raich, 239 U. S. 33, 36 S. Ct. 7, 60 L. Ed. 131, L. R. A. 1916D, 545, Ann. Cas. 1917B, 283. The question here is whether the self-interest of the national organization in its purpose to protect the unionized markets in New York and elsewhere is a sufficient justification for its interference with the plaintiff's business which, without justifiable cause, concededly would be a legal wrong. The decisions of the Supreme Court compel the conclusion that the question is no longer an open one. The answer of the court to it is to be found in Hitchman Coal Co. v. Mitchell, supra, as modified in American Foundries v. Tri-City Council, 257 U. S. 184, 42 S. Ct. 72, 79, 66 L. Ed. 189, 27 A. L. R. 360. While the decision in the Hitchman Case condemned the method adopted as unlawful, the decision was placed equally upon the unlawfulness of the purpose, and upon that question the entire issue was justification by self-interest for interference with the business of another. The dissenting opinions of Mr. Justice Brandeis in the Hitchman Case and in Duplex Co. v. Deering, 254 U. S. 443, 41 S. Ct. 172, 184, 65 L. Ed. 349, 16 A. L. R. 196, state the case for the defendants here. The conclusion which Justice Brandeis reached in the latter case, and which the majority of the court did not adopt, was that neither the common law nor the statutes of the United States deny "the right of industrial combatants to push their struggle to the limits of the justification of self-interest." Those limits were subsequently somewhat expanded by the court in American Foundries v. Tri-City Council, supra, but beyond that decision no step has been taken. In that case it appeared that a local labor body, composed of representatives of a number of trade unions in three adjoining towns in Illinois, assisted in procuring and bringing about strikes in a local foundry which had just begun work after a shutdown and was attempting to run on a nonunion basis at lower than union wages. It appeared (257 U. S. 208, 42 S. Ct. 78) that many members of the local unions represented by the labor body were looking forward to employment when the complainant should resume full operations, and the court held that, even though not employees or ex-employees, they were directly interested in the wages which were to be paid. The decision was that the central body and the members of the local unions which it represented had sufficient interest in the wages paid by the complainant to its employees to justify their use of lawful and peaceable persuasion to induce those employees not to accept such reduced wages and to quit their employment. It will be seen how far short this is of holding that the protection of union laborers in distant markets who have no prospect of employment or direct interest in the wages paid is a sufficient justification.

In the American Foundries Case, the Hitchman Case was distinguished, and, in reviewing it, the court said: "There the action was by a coal mining company of West Virginia against the officers of an International Labor Union and others to enjoin them from carrying out a plan to bring the employees of the complainant company and all the West Virginia mining companies into the International Union, so that the Union could control, through the union employees, the production and sale of coal in West Virginia, in competition with the mines of Ohio and other States. * * * This court held that the purpose was not lawful, and that the means were not lawful and that the defendants were thus engaged in an unlawful conspiracy which should be enjoined. * * * The statement of the purpose of the plan is sufficient to show the remoteness of the benefit ultimately to be derived by the members of the International Union from its success and the formidable, country-wide and dangerous character of the control of interstate commerce sought." Lest there should

be any misunderstanding as to the limited scope of the decision in the American Foundries Case, the court was careful to say: "The principle of the unlawfulness of maliciously enticing laborers still remains and action may be maintained therefore in proper cases. * * *" True, the court said that the unlawful and deceitful means adopted by the defendants in the Hitchman Case to accomplish their purpose were quite enough to sustain the decision of the court without more, but there was in that case a positive decision that the purpose was also unlawful. "Where there are two grounds upon either of which an appellate court may rest its decision, and it adopts both, the ruling on neither is obiter dictum, but each is the judgment of the court, and of equal validity." U. S. v. Title Insurance Co., 265 U. S. 472, 44 S. Ct. 621, 623, 68 L. Ed. 1110. If the principle of the unlawfulness of maliciously enticing laborers, which was one of the bases upon which the Hitchman Case was decided, still remains, it must be applied to a case like the instant one, where the self-interest of the defendants is totally unconnected with the employment interfered with. The only alternative would be to hold that any motive, other than personal spite or malignity against the employer, is justifiable cause—a result which would totally nullify the principle itself.

Hitchman Coal Co. v. Mitchell and American Foundries v. Tri-City Council were common-law cases, and a study of them leaves no doubt that, upon the question of justification, the present case is far outside of the limits of the American Foundries Case declaring what is lawful, and well within the limits of the Hitchman Case declaring what is not. When we turn to the common law of Pennsylvania, we find what appears to be a total denial of self-interest as a justification for procuring the employees of another to strike. In Purvis v. United Brotherhood, 214 Pa. 348, 63 A. 585, 589, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757, 6 Ann. Cas. 1275, the court said: "True, the defendants contend and testify that their purpose was to benefit their own members. This, doubtless, in a sense, is true, but the benefits sought were the remote purpose, which was to be secured through the more immediate purpose of coercing the plaintiffs into complying with their demands, or otherwise injuring them in their business, and the court cannot, in this proceeding, look beyond the immediate injury to the remote results. Such is the doctrine laid down in Eddy on Combinations and quoted with approval in the case of Erdman v. Mitchell, supra [207 Pa. 79, 56 A. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783], as follows: 'The benefit to the members of the combination is so remote, as compared to the direct and immediate injury inflicted upon the nonunion workmen' (in this case the nonunion mill-owners) 'that the law does not look beyond the immediate loss and damage to the innocent parties to the remote benefits that might result to the union." The conclusion is that at common law, both in Pennsylvania and under the federal decisions, irrespective of any question of procurement of breach of contract, the efforts of the defendants even by peaceful persuasion to bring about strikes in the plants of the plaintiffs are without justification and therefore actionable.

The element of obtaining breaches of contract is not made a basis for these injunctions. Similar contracts were in existence in the Hitchman Case. In that case the method of the defendants was slightly different from that adopted by these defendants here. What was done there was to secretly sign up as many employees as possible as members of the union, inducing them to remain in the employ of the complainant in violation of their contracts, and then when a sufficient number had been obtained call a strike which would cripple the operation of the mine. In the present cases, as has been pointed out, there were plenty of instances where the employees were invited to join the union before leaving the plaintiff's employ —also in violation of their contracts. In others the strikes were called first. However, in view of the conclusion reached as to the unlawfulness at common law of the defendant's program, it is unnecessary to decide whether their total disregard of the contracts is within the rule of the Hitchman Case upon that point.

There remains to be considered the proceeding in which the basis of the plaintiff's action is the alleged violation of the antitrust laws. The law upon this point was declared in Coronado Coal Co. v. United Mine Workers, 268 U. S. 295, 45 S. Ct. 551, 556, 69 L. Ed. 963, known as the Second Coronado Case. That was a strike to prevent the attempted nonunion operation of a mine located in a unionized field. There are just two points of difference which distinguish the facts of that case from those now before the court, neither of which had any bearing upon the ratio decidendi of the former. First, in the Coronado Case, the action which precipitated the strike was the attempt of a mining company to operate a nonunion mine in a

unionized field. The only effect of this difference would be to give some basis for a contention that the union's action in that case was defensive rather than aggressive, since an invasion of what might be considered their field was threatened. The other point of distinction is that the strike in the Coronado Case was accompanied by violence and destruction of the property of the employers. This, however, was a mere incident, and did not in any degree affect the basis of the decision. While there was no evidence in that case to connect the national labor body with the strikes, the ground upon which the district body was held liable was exactly the same upon which the temporary injunction in this case was issued. The court said: "We think there was substantial evidence at the second trial in this case tending to show that the purpose of the destruction of the mines was to stop the production of nonunion coal and prevent its shipment to markets of other States than Arkansas, where it would by competition tend to reduce the price of the commodity and affect injuriously the maintenance of wages for union labor in competing mines." The court found this evidence (a) in the declarations of union leaders and the proceedings of the union conventions and (b) in the necessary effect of the stoppage of production upon interstate commerce. Referring to the latter kind of evidence, the court said: "Such conclusion was possibly subject to criticism as exaggerated and speculative, and dependent on conditions probably not realizable, but it was all relevant evidence for the jury to consider and weigh as a circumstance with the rest of the new testimony in proof of intent of the leaders of District No. 21 to prevent shipments to neighboring States of such an amount of nonunion coal at nonunion cost." In the case before the court the declarations of the union leaders and its official organ as to their intention are clear and explicit, the resolutions of the convention authorizing the campaign for the unionization of the Philadelphia market carry an equally definite statement of purpose, and consideration of the figures in evidence as to the extent of the Philadelphia production as compared with that of New York leaves no doubt as to the far-reaching effect upon the control of interstate commerce which would be accomplished by the stopping of production in the Philadelphia field. It is beyond all question that the purpose of the Amalgamated in this case is to stop the production of nonunion clothing in Philadelphia. Unless and until the manufacturers there were willing to produce upon a union basis, under a union wage scale and upon union terms, the Amalgamated did not intend to permit them to produce at all.

The doctrine of the Coronado Case is that it is the intent to stop production for the purpose of controlling interstate commerce and not the methods used which makes the act unlawful. The court made this perfectly clear in stating: "The mere reduction in the supply of an article to be shipped in interstate commerce by the illegal or tortious prevention of its manufacture or production is ordinarily an indirect and remote obstruction to that commerce. But when the intent of those unlawfully preventing the manufacture or production is shown to be to restrain or control the supply entering and moving in interstate commerce, or the price of it in interstate markets, their action is a direct violation of the Anti-Trust Act." If this is so, then it can make no difference that the union proceeded to carry out its purpose by means of a series of strikes rather than by the destruction of the physical instrumentalities of production. The later cases of United States v. Brims, 272 U. S. 549, 47 S. Ct. 169, 71 L. Ed. 403, and Bedford Co. v. Stone Cutters Ass'n, 274 U. S. 37, 47 S. Ct. 522, 71 L. Ed. 916, 54 A. L. R. 791, as well as Duplex Co. v. Deering, supra, are authority for the proposition that a restraint of commerce in violation of the anti-trust laws may be accomplished by strikes and persuasion without physical interference with the instrumentalities of either transportation or production. None of these cases are in conflict with United Leather Workers v. Herkert & Meisel Trunk Co., 265 U. S. 457, 44 S. Ct. 623, 68 L. Ed. 1104, 33 A. L. R. 566, which holds that the mere fact that the effect of a strike will be to reduce the quantity of goods produced for shipment in interstate commerce is not of itself sufficient evidence of an intent to unlawfully restrain or control such commerce. The Coronado Case, as has been seen, held that such effect might be considered, but only as evidence of the intention, which was the point sought in each case. I conclude that the procuring of strikes by the defendants in the complainant's factories under the circumstances of this case, and with the intention here manifest, constitute violations of the Sherman Act, and as such may be restrained.