UNITED CHAIN THEATRES, Inc., et al. v. PHILADELPHIA MOVING PICTURE MACHINE OPERATORS UNION, LOCAL NO. 307, et al.

No. 6509.

District Court, E. D. Pennsylvania.

May 5, 1931.

Sigmund H. Steinberg, of Philadelphia, Pa., and Howard A. Lehman, of Bethlehem, Pa., for plaintiffs.

Frank B. Murdoch, Jr., of Philadelphia, Pa., for defendants.

## Findings of Fact.

KIRKPATRICK, District Judge.

1. The plaintiff, United Chain Theatres, Inc., is an operating company engaged in the business of operating a number of moving picture theatres in Philadelphia, including the two involved in this suit, which are, respectively, Nixon's Grand Theatre at Broad street and Montgomery avenue, having a seating capacity of some 3,000, and the Roxy at Ridge avenue and Leverington street, with a seating capacity of about 1,700. Each of these theatres requires, in addition to other employees, two moving picture operators, an employment calling for a considerable amount of training and skill.

2. The defendant, the Philadelphia Moving Picture Machine Operators Union, Local No. 307, is a union consisting of 253 members. Affiliated with it are some 125 non-union men known as "permit men" who obtain employment through the union and who are subject to union regulations and orders. The total number of licensed moving picture operators in the city of Philadelphia is about 3,000. There are about 150 theatres in Philadelphia each of which employs two regular operators, a small number of additional men being required from time to time for relief and extra work.

3. When the plaintiff took over the operation of the Roxy Theatre and of Nixon's Grand (December 1, 1929, and December 1, 1930, respectively), the operators were union men employed by the former owners of these theatres. Their wages and terms of employment were regulated by a contract between the theatre owners and the union which contract imposed upon the owners certain restrictions as to the employment and discharging of men, wages, hours, working conditions, and other matters. The plaintiff, upon taking control of the theatres, promptly discharged the union men and employed non-union men at a lower wage scale and without any contract restrictions upon its relations with them as employees.

4. The discharge of the union operators by the plaintiff when it took over the theatres was intended by it and accepted by the defendant union as the definite and final inauguration of a policy not to employ union men. The union had already taken an equally definite and fixed stand upon the question of wages and conditions of employment, embodied in the regular union contract with the theatres. No negotiations looking toward employment of union men or to a modification of union terms have taken place between the parties at any time, and it is evident that any attempt at compromise by either side would be futile. It is more than probable that nothing short of a complete surrender by one side or the other can end the controversy and even so it is doubtful whether the plaintiff would again employ union men upon any terms.

5. The defendant union began the series of acts complained of in this bill about March 16, 1931. These acts consisted of three general classes and were as follows: (a) Sending of postal cards enclosed in envelopes to a very large number of potential patrons living in the general neighborhood of each of the theatres involved. These postals vary somewhat in language but in general notify the recipient that the plaintiff's theatres do not employ union operators and do not pay "regular wages" or "an American living wage." Some of the postals close with a request for "support" or for "moral support," while others ask the recipient to help in the fight against the theatres by "patronizing other theatres which give the Philadelphia working men a square deal." (b) Driving in the neighborhood of the theatres a "music wagon" bearing large printed signs and placards containing messages similar to those appearing on the post cards. (c) Employing men, most of whom are members of the union or permit men, to walk up and down in front of the theatres, bearing printed signs hung on their shoulders, examples of which signs are as follows: "Nixon's Grand is unfair to organized labor." "Nixon's Grand refuses to employ union moving picture operators, members of the A. F. of L. at American living wages." "Nixon's Grand no longer employs union moving picture operators, members of A. F. of L." "Nixon's Grand locked out union moving picture operators members of A. F. of L."

6. None of the messages conveyed by any of the above-mentioned means to the potential patrons of the plaintiff's theatres contain any threat of injury or inconvenience of any kind to persons who patronize the theatres, nor do they contain any matter which is abusive or libelous. The statements that the theatres refused to pay American living wage and that they are unfair to organized labor are, in view of the fact that they have, without cause other than such as arises from their union affiliation, discharged union men and employed others at lower wages, at least matters of argument entitled to be taken as made in good faith.

7. At Nixon's Grand Theatre the sidewalk is patroled or picketed by four men during the hours when the theatre is open for business. In addition to this, a relief consisting of two, three, or four men sit continuously in a parked automobile along the curb within a few feet of the theatre property. The Roxy Theatre is picketed by two men during evenings and Saturday afternoons only. The defendant has instructed all of these men not to obstruct in any way free access of patrons to the theatre and not under any circumstances to speak to any one. In general these instructions have been observed and the picketing has been carried out without physical violence and without any threat, menace, insult, or annoyance to patrons of the theatre. There have been a few occasions where one or two of the men have overstepped the bounds of their instructions and have annoyed patrons by holding out their signs in front of them or by walking so close to the theatre entrance as to cause inconvenience in entering. These occasions have been exceptional and have not been authorized or countenanced by the defendant.

8. The effect of the defendant's campaign has been very substantially to reduce the patronage at both theatres. At Nixon's Grand Theatre the average weekly attendance has dropped from approximately 11,000 to approximately 8,000; at the Roxy, from approximately 8,700 to approximately 7,200. This reduction in patronage is a substantial and serious injury to the plaintiff's business and so long as it continues the plaintiff will be unable to operate the theatres at a profit.

### Discussion.

This plaintiff's business, or its reasonable expectation of continued patronage from the public, is property. Duplex Printing Press Company v. Deering, 254 U. S. 443, 465, 41 S. Ct. 172, 65 L. Ed. 349, 16 A. L. R. 196; Truax v. Corrigan, 257 U. S. 312, 327, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375. Intentional injury to another's property is prima facie a tort and, where necessary to prevent irreparable injury, will be restrained by injunction. A man's business is, generally speaking, entitled to the same protection by law as any other kind of property; but where injury to business occurs or is threatened in the course of one of the conflicts generally accepted as necessarily incident to economic and social progress, the law may under certain circumstances permit the injury and withhold the remedy. Whether it will or not depends ultimately upon public policy, but the method of determining each particular case usually takes the form of an inquiry whether the acts causing or threatening the injury are for a justifiable purpose.

Where the conflict is between employees and employers, self-interest is generally accepted by the law as a justification for acts by employees, injurious to the employer's business. But in such cases self-interest is not always a justification. An essential requirement is that it be not too remote. I had occasion to consider this question in Alco-Zander Company v. Amalgamated Clothing Workers of America, 35 F. (2d) 203, and there held that the interest of union men in a distant city with no possible expectation of employment here was too remote to justify the calling of unprovoked strikes in industries in Philadelphia, the sole purpose being to protect unionized markets in the city in which the defendants were located. The decision of the Supreme Court in Hitchman Coal & Coke Company v. Mitchell, 245 U. S. 229, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461, required such holding.

In the case at hand, however, these defendants are directly and immediately interested in employment at the plaintiff's theatres. They want the jobs for their own members and they want them at the wages and under the restrictions established by the regular union contract which is in force in most of the theatres in Philadelphia. It is quite true that the immediate effort here is to unionize the plaintiff's business but, more than in the ordinary case, this is only an intermediate step in obtaining what is really desired, namely, employment for union men at union wages and on union terms. While no member of the defendant union is now actually seeking employment in the plaintiff's theatres, some of them have been employed there and each one of them is a potential employee. Thus the union has much more than a remote interest in the plaintiff's relations with employees.

In American Steel Foundries v. Tri-City Central Trades Council, 257 U. S. 184, 42 S. Ct. 72, 66 L. Ed. 189, 27 A. L. R. 360, the Supreme Court held that members of labor unions in three adjoining towns, although not ex-employees, had sufficient interest in the wages paid by a manufacturing plant which was resuming operations with a skeleton force of men, to justify them in promoting a strike by employees against a reduced scale of wages. The nearness of the self-interest of the unions in the Tri-City Case is the thing which distinguishes it from

the Hitchman Case and justifies conduct which, where the interest is more remote, is unjustifiable. I entertain no doubt that the self-interest of the defendants in the present case is no more remote than that of the defendants in the Tri-City Case, and that it furnishes a legal justification for the injury occasioned to the plaintiff's business by their conduct.

It may be objected that what was involved in the Tri-City Case was persuasion of employees to quit their employment, whereas the defendant's conduct here takes the form of persuasion of the general public to withhold their patronage. There is really no substantial difference. "I do not perceive any distinction upon which a legal difference of treatment should be based between a lockout, a strike, and a boycott. They often look very unlike, but this litigation illustrates their basic identity. All are voluntary abstentions from acts which normal persons usually perform for mutual benefit; in all the reason for such abstention is a determination to conquer and attain desire by proving that the endurance of the attack will outlast the resistance of the defense." Hough, in Gill Engraving Company v. Doerr (D. C.) 214 F. 111, 119.

Paradoxical as it may seem, the wide difference between the conditions of the controversy in this case and that in the Tri-City Case affords the strongest reason for dealing with the conduct of the defendants in both cases upon the same basis. In the Tri-City Case the plaintiff required a large supply of labor which the defendant had at its command and could withhold, thereby inflicting upon the plaintiff the only economic injury within its power; for it is obvious that little or nothing could have been accomplished in that case by appeals to the plaintiff's customers not to deal with it. In the present case the plaintiff employs only two men at each theatre. The outside supply of labor is practically unlimited. The calling of strikes would be perfectly futile, and to limit the effect of the Tri-City decision to strike cases only would be to put it upon a ground which has nothing whatever to do with its basic principle—justification by self-interest—and to deny to employees in cases like the present resort to their only practicable weapon.

The conclusion that the defendants' course of conduct was justified by its purpose means simply that the bare fact of injury to the plaintiff's business, caused intentionally by the defendants, will not, under the circumstances of this case, entitle the plaintiff to relief. It still remains to consider the means adopted by the defendants.

Peaceful persuasion is universally recognized as a lawful method, and such peaceful persuasion may be addressed to patrons and customers as well as employees. On the other hand, the minute that the limits of peaceful persuasion are over-stepped and the element of coercion enters into the case, the entire course of conduct becomes unlawful. This is true whether coercion consists of actual violence, threats of violence, intimidation, or of economic coercion such as the withdrawal of patronage from or refusal to deal with persons who patronize the employer (the so-called secondary boycott). Of course, the threats need not be express to make conduct unlawful and intimidation may be and frequently is accomplished by the mere presence of numbers, by demeanor and bearing and without the spoken word. It was because of this that picketing generally was held in the Tri-City Case to be inconsistent with peaceful persuasion and when so conducted to be unlawful, and it was because the circulation of "unfair" lists, in the case of Gompers v. Buck's Stove & Range Company, 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, involved coercion by implied threats of loss of business to those to whom they were addressed that the use of such lists was held to be actionable. The decision in Truax v. Corrigan, 257 U. S. 312, 42 S. Ct. 124, 66 L. Ed. 254, 27 A. L. R. 375, rested upon the clear illegality of the means used which involved almost all the elements condemned by the courts except actual physical violence.

But, as was pointed out in the Tri-City Case, each case must turn upon its own circumstances. In the present case the defendants are entitled to advise the public of the existence of their controversy with the plaintiff and of the reason for it and to ask for public support and to request their friends and the public generally to assist them by not patronizing the plaintiff. I cannot find in anything that they have said any element of threat or of coercion.

On the other hand, I am inclined to think that the presence of four men patroling the sidewalk in front of Nixon's Grand Theatre together with sympathizers in an automobile parked at the curb cannot but constitute a kind of implied threat or intimidation as to such of the public as are susceptible to that sort of influence. In addi-

tion, I do not see how in crowded hours accidental physical contacts can be avoided which may amount to annoyance to the patrons and obstruction of their free access to the theatre. I will therefore direct that the number of men at Nixon's Grand Theatre be limited to two and that the defendant be restrained from permitting its agents to remain in a parked automobile at the curb while the pickets are on the sidewalk. It will also be required that the pickets remain at a distance of at least half of the sidewalk away from the steps leading to the theatre entrance.

I have conferred with counsel in the case and am satisfied, in view of their assurances, that the foregoing directions will be voluntarily complied with and that it will not be necessary to issue an injunction. The defendants' campaign has been generally well conducted. It was undertaken under advice of counsel and during the pendency of these proceedings they have at the suggestion of the court voluntarily suspended all operations. Specifically, in regard to the matters just referred to my finding is that the conduct criticized has been discontinued and that there is no reason to apprehend that it will be resumed.

The bill may be dismissed. Of course, such dismissal will not preclude the plaintiffs from taking further action in the event that any illegal acts occur hereafter. The costs will be divided two-thirds to the plaintiffs and one-third to the defendants.