GLOVER et al. v. RETAIL CLERK'S UNION LOCAL 1392 et al.
No. 4771.

District Court of Alaska. First Division. Juneau.
May 6, 1942.

H. D. Stabler, of Juneau, for plaintiffs.

Grover C. Winn, of Juneau, for defendants.

ALEXANDER, District Judge.

The question presented for determination in this case concerns the right of labor to picket an employer's place of business, where the employer has no employees and claims that no labor dispute exists between it and the defendant union or its members.

The controversy arose over a demand made upon the plaintiffs by a representative of the union to sign a contract with the union to close its place of business at 5 o'clock P. M. in accord with the union's rules or practice. This the plaintiffs refused to do, resulting in the picketing and other acts of the union of which the plaintiffs complain.

The complaint in this case alleges in substance that the plaintiffs are copartners and as such own and operate a small delicatessen store at Juneau, as "Spruce Delicatessen"; that they have no employees but do all the work themselves; that they have no contract or agreement with the defendant union nor with the individual defendants; that no labor dispute exists between themselves and said union or with the individual defendants. The complaint then alleges that the defendant Chinella, acting in his own behalf and on behalf of the defendant union and its members, summarily and arbitrarily, and without authority of law, demanded that plaintiffs make and execute an agreement with him and with said union and its members to close their store at 5 o'clock P.M. daily, and cease doing any business whatever after that hour, and threatened that unless plaintiffs did make and execute such an agreement and did so close their said store that he and the defendant union and

its members would picket the plaintiffs' said store and would drive away plaintiffs' customers and would prevent plaintiffs from obtaining supplies into their said store for maintenance of their said business, and would ruin plaintiffs' said business and would break the plaintiffs financially and put them out of their said business.

"That plaintiffs refused, and still continue to refuse, to enter into any such agreement with said defendant Chinella or with said union and its members, and plaintiffs continued, and despite said threats and the acts and conduct of the defendants as hereinafter related, still continue to keep open their said store daily after 5 o'clock P.M. for the purpose of transacting business with such customers and other persons as may choose to do business with the plaintiffs."

That in furtherance of the common purpose and design of the defendants, and to effect the objects and purposes thereof, said defendants conspired to ruin plaintiffs' business by picketing their store daily, by walking in front of the entrance to plaintiffs' said store carrying and displaying a sign whereon were the following words, "This store is unfair to organized labor; Retail Clerks Union Local 1392," and by causing to be published daily, except Sunday, in "The Alaska Press" a newspaper of general circulation published in Juneau, Alaska, a large conspicuous advertisement in lettering and words as follows: "We do not patronize Montgomery Ward & Company, Proctor & Gamble, Gatner & Mattern Knit Goods, Carnation Milk Company, Spruce Delicatessen of Juneau. Central Labor Council, affiliated with A. F. of L."; and by running an identical advertisement in "The Daily Alaska Empire," a newspaper of general circulation published at Juneau, Alaska daily, except Sunday; and by creating a picket line through which union transport workers would not pass, coerced and induced union transport workers not to transport plaintiffs' goods and merchandise, in consequence whereof plaintiffs have been and still are prevented from obtaining goods and merchandise for sale in their said store. That in conse-

quence of defendants' said acts and conduct the plaintiffs have been damaged as alleged.

To plaintiffs' complaint the defendants have filed a demurrer in which three causes of demurrer are set up,

First: That said complaint fails to state facts sufficient to constitute a cause of action.

Second: That this court has no jurisdiction of the persons of the defendants or of the subject matter of the action; and

Third: That there is a defect of parties defendant.

However, only the first ground of demurrer was urged at the argument or in the briefs filed by the parties; the second and third grounds being either waived or wholly ignored. We shall therefore address our attention solely to the first ground of the demurrer.

Broadly stated, the position taken by the plaintiffs in their brief is that in the absence of any labor dispute between themselves and the defendants, the defendants have no right to demand that they close their business at 5 o'clock P.M., or any other time, or to picket or otherwise interfere with the operation of their business upon their failure or refusal to comply with the defendants' demand.

On the other hand, the defendants maintain that they and their officers and members have a direct, substantial and legitimate interest in and a right to demand that the plaintiffs close their business at 5 P.M. in accordance with union regulations and practices, and that upon plaintiffs' failure so to do that they have a right to picket and employ the other means complained of by plaintiffs to enforce their demands, and that, since they are employing means which are entirely lawful, that plaintiffs have no legal grounds for action against them.

The history of the law governing the right of working men to combine in order to bargain for better working conditions is marked with much divergence of opinion, with many changes through the years. This development has slowly but steadily progressed to the point where the courts

now hold that even an intentional interference with the advantageous economic relations of others by the members of labor organizations is not tortious unless violence is used or the object sought to be accomplished has no reasonable relevance to labor conditions.

Therefore, the issues in the present controversy present mainly two questions: (1) Whether the specific activities carried on by the defendants are peaceful and (2) Whether there is any legal justification for their conduct, in view of the objects which they seek to obtain.

■ It now appears to be well settled that workmen may associate themselves together and exert various forms of economic pressure upon employers, provided they act peaceably and honestly.

■ The usual means of exerting this economic pressure which have been held lawful, are the strike (with which we are not concerned here) the boycott, both in primary and secondary, Parkinson Co. v. Bldg. Trades Council, 154 Cal. 581, 98 P. 1027, 21 L.R.A.,N.S., 550, 16 Ann.Cas. 1165, Pierce v. Stablemen's Union, 156 Cal. 70, 103 P. 324; and the picket Lisse v. Local Union, 1935, 2 Cal.2d 312, 41 P.2d 314; In re Lyons, 27 Cal.App.2d 182, 80 P.2d 745.

■ By the great weight of authority, peaceful picketing, so long as it does not in fact involve fraud, intimidation, breach of the peace or coercion has been sustained in many cases. People v. Harris, 104 Colo. 386, 91 P.2d 989–991, 122 A.L.R. 1034; Pope Motor Car Co. v. Keegan, C. C., 150 F. 148; Steffes v. Motion Picture Mach. Operators Union, 136 Minn. 200, 161 N.W. 524; Bayonne Textile Corp. v. American Fed. of Silk Workers, 116 N.J.Eq. 146, 172 A. 551, 92 A.L.R. 1450; Exchange Bakery & Restaurant v. Rifkin, 245 N.Y. 260, 157 N.E. 130; Greenfield v. Central Labor Council, 104 Or. 236, 192 P. 783, 207 P. 168; Iron Molders' Union v. Allis-Chalmers Co., 7 Cir., 166 F. 45, 20 L.R.A.,N.S., 315; American Steel Foundries v.

Tri-City Central Trades Council, 257 U.S. 184, 42 S.Ct. 72, 66 L.Ed. 189, 27 A.L.R. 360; Senn v. Tile Layers Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Lauf v. E. G. Shinner & Co., Inc., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872.

"It is an appeal to the public and to members of the union not to patronize an employer who does not conform to the standards of organized labor relative to wages, *hours*, and conditions of employment. The mere fact that an employer may sustain loss of business as a result of such picketing does not warrant an intervention. It is damnum absque injuria. No person has a vested right to the patronage of those who are not in accord with his standards of employment." People v. Harris, 104 Colo. 386, 91 P.2d 989–992, 122 A.L.R. 1034; United Chain Theatres v. Philadelphia M.P.M.O. Union, D.C., 50 F.2d 189; S. A. Clark Lunch Co. v. Cleveland Waiters & Beverage Dispensers Local, 22 Ohio App. 265, 154 N.E. 362.

Such loss, under our social and economic system, is merely the result of conflict of interests between capital and labor. That the employer has a right to refuse to pay union wages and maintain union standards is conceded. Correspondingly labor has the right to decline to carry on any business relation with such an employer.

But the law clearly requires that concerted action by union workers (or others) be peaceful. Acts of violence or acts amounting to physical intimidation will be enjoined or form the basis for damages. Goldberg, etc., Co. v. Stablemen's Union, 1906, 149 Cal. 429, 86 P. 806, 8 L.R.A.,N.S., 460, 117 Am.St.Rep. 145, 9 Ann.Cas. 1219; Southern California Iron & Steel Co. v. Amalgamated Association, 186 Cal. 604, 200 P. 1; Lisse v. Local Union, supra.

There is nothing in the complaint under consideration which indicates that the activities of the defendants were anything other than peaceful and honest within the meaning of the authorities quoted, or other controlling authori-

ties on that subject. The complaint merely alleges that the defendants have placed a picket in front of plaintiffs' place of business carrying a sign whereon were the words, "This store is unfair to organized labor, Retail Clerks Union Local Number 1392"; and caused to be published a "We do not patronize" list in two of the daily papers; and had created a picket line through which union transport workers would not pass, in consequence whereof the plaintiffs were prevented from obtaining the delivery of merchandise to their store.

It is true that plaintiffs also allege that the picket line thus established prevented the delivery of merchandise to their store, because union transport workers were thereby "coerced and induced" not to transport plaintiffs' goods and merchandise, but no violence or other unlawful acts are alleged in connection therewith; hence the allegation of "coercion" is merely a conclusion with no facts to substantiate it, and do not become coercive simply because the plaintiffs allege that they amount to coercion. Neither would threats of the character alleged, which were only what the defendants had a legal right to do, form the basis for legal action.

In commenting upon a similar situation, Mr. Justice Holmes in Vegelahn v. Guntner, 167 Mass. 92, 44 N.E. 1077, 1081, 35 L.R.A. 722, 57 Am.St.Rep. 443, said, "I pause here to remark that the word 'threats' often is used as if, when it appeared that threats had been made, it appeared that unlawful conduct had begun. But it depends on what you threaten. As a general rule, even if subject to some exceptions, what you may do in a certain event you may threaten to do—that is, give warning of your intention to do—in that event, and thus allow the other person the chance of avoiding the consequence. So. as to 'compulsion,' it depends on how you 'compel.' * * * So as to 'annoyance' or 'intimidation'," and hence no cause of action is stated if the object of the defendants' conduct was a lawful purpose.

■ The plaintiffs do not challenge the soundness of these principles, but urge that they do not apply here because there is no "labor dispute." The term "labor dispute" has been defined in Smith Metropolitan Market Co. v. Lyons, 16 Cal.2d 389, 106 P.2d 414, 421, as a broad one, and in the absence of statutory definition may be properly applied to any controversy "which is reasonably related to employment and to the purposes of collective bargaining."

The interest of the defendant union and its members in the present controversy is direct and obvious. The closing of the plaintiffs' business in compliance with union hours is of at least indirect benefit to the defendants in protecting them from a character of competition that would weaken their organization and possibly breed a class of unfair competition that they had sought to protect themselves from by securing a compliance with such rules or regulations from their own employers.

In Nann v. Raimist, 255 N.Y. 307, 174 N.E. 690, 693, 73 A.L.R. 669, Chief Judge Cardozo said: "If the defendant believes in good faith that the policy pursued by the plaintiff and by the shops united with the plaintiff is hostile to the interests of organized labor, and is likely, if not suppressed, to lower the standards of living for workers in the trade, it has the privilege by the pressure of notoriety and persuasion, to bring its own policy to triumph."

And again, as was said by Justice Moore in McKay v. Retail Automobile Salesmen's Local Union No. 1067, 16 Cal.2d 311, 106 P.2d 373, loc.cit. 384: "In order to enforce a demand reasonably relating to labor conditions a union is justified, by a long line of decisions, in resorting to any peaceable legal means. The courts have supported the union's right to strike, picket and boycott in the enforcement of such demands including the right to induce those in sympathy with its cause to withdraw patronage from an employer. * * * If labor should be prohibited from publishing all the facts concerning employment by an employer, the worker would be deprived of

rights emphatically and often declared. The assertion that defendants 'conspired' to injure the employer could have no significance unless they were engaged in a criminal or unlawful enterprise. * * * The demands of a union to strengthen its forces cannot be deemed unlawful even though there be no controversy between the employer and his employees."

Justice Brandeis also very pertinently said, in Senn v. Tile Layers Protective Union, 301 U.S. 465, 57 S.Ct. 857, 863, 81 L.Ed. 1229: "Earning a living is dependent upon securing work; and securing work is dependent upon public favor. To win the patronage of the public each may strive by legal means. * * * It is true that disclosure of the facts of the labor dispute may be annoying to Senn, even if the method and means employed in giving the publicity are inherently unobjectionable. But such annoyance, like that often suffered from publicity in other connections, is not an invasion of the liberty guaranteed by the Constitution."

■■■ This controversy might have been brought within the classification of "labor disputes", it being a controversy involving "hours" and "conditions of employment," and the courts having held that the relation of employer and employee need not exist in such cases, but we are not confined to or dependent on a showing that the controversy in question is a "labor dispute." The more recent cases justify conduct, such as that charged against the defendants, on the broader ground of their constitutional guaranty of the right to free speech.

■■■ The modern trend of decisions clearly indicates that the right to picket peacefully and truthfully is one of organized labor's lawful means of advertising its grievances to the public, and as such is guaranteed by the Constitution as an incident of freedom of speech. Senn v. Tile Layers Union, 301 U.S. 468, 57 S.Ct. 857, 81 L.Ed. 1229; Carlson v. California, 1940, 310 U.S. 106, 60 S.Ct. 746, 84 L.Ed. 1104; Thornhill v. Alabama, 1940, 310 U.S. 88,

60 S.Ct. 736, 84 L.Ed. 1093; In re Lyons, 1938, supra; People v. Harris, 1939, 104 Colo. 386, 91 P.2d 989, 122 A.L.R. 1034.

In In re Lyons, 27 Cal.App.2d 293, 81 P.2d 190, 193, the Court had before it contempt proceedings growing out of a labor dispute. Relating to the constitutional issue of freedom of speech, the court said: "In this state the right to peacefully picket rests upon the constitutional guaranty of the right of free speech. We cannot see how the right to peacefully picket, under the guaranty of free speech, could be confined to cases in which there exists a dispute between an employer and organized labor over hours or conditions of employment, rate of pay, * * * and not extended to a dispute between a business man and any citizen or group of citizens who may differ with him on a question of business policy. The guaranty of the right of free speech is general and extends to every class or group of citizens."

In Thornhill v. Alabama, 310 U.S. 88–91, 60 S.Ct. 736, 740, 84 L.Ed. 1093, the court said:

"The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state. The safeguarding of these rights to the ends that men may speak as they think on matters vital to them and that falsehoods may be exposed through the processes of education and discussion is essential to free government."

Continuing, the court further said: (at pages 102, 103 of 310 U.S., at page 744 of 60 S.Ct., 84 L.Ed. 1093)

"In the circumstances of our times the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution. * * * Free discussion concerning the conditions in industry and the causes of labor disputes appears to us indispensable to the effective

and intelligent use of the processes of popular government to shape the destiny of modern industrial society. * * * We concur in the observation of Mr. Justice Brandeis, speaking for the Court in Senn's case (301 U.S. at page 478, 57 S.Ct. [857] at page 862, 81 L.Ed. 1229): 'Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.'"

In Milk Wagon Drivers Union v. Meadowmoor Dairies, 312 U.S. 287–297, 61 S.Ct. 552, 556, 85 L.Ed. 836, 132 A. L.R. 1200, Mr. Justice Frankfurter, speaking for the court, says: "We do not qualify the Thornhill and Carlson decisions. We reaffirm them."

In American Federation of Labor v. Swing, 1940, 312 U.S. 321–325, 61 S.Ct. 568, 570, 85 L.Ed. 855, Justice Frankfurter, again speaking for the court, said: "All that we have before us, then, is an instance of 'peaceful persuasion' disentangled from violence and free from 'picketing en masse or otherwise conducted' so as to occasion 'imminent and aggravated danger.'"

Regarding such a situation, the court says: "Such a ban of free communication is inconsistent with the guarantee of freedom of speech. * * * The scope of the Fourteenth Amendment is not confined by the notion of a particular state regarding the wise limits of an injunction in an industrial dispute, whether those limits be defined by statute or by the judicial organ of the state. A state cannot exclude workingmen from peacefully exercising the right of free communication by drawing a circle of economic competition between employers and workers so small as to contain only an employer and those directly employed by him. The interdependence of economic interest of all engaged in the same industry has become a commonplace. American [Steel] Foundries v. Tri-City Council, 257 U.S. 184–209, 42 S.Ct. 72, 78, 66 L.Ed. 189, 27 A.L.R. 360. The right of free communication cannot therefore be mutilated by deny-

ing it to workers, in a dispute with an employer, even though they are not in his employ. Communication by such employees of the facts of a dispute, deemed by them to be relevant to their interests, can no more be barred because of concern for the economic interests against which they are seeking to enlist public opinion than could the utterance protected in Thornhill's case. 'Members of a union might, without special statutory authorization by a state, make known the facts of a labor dispute, for freedom of speech is guaranteed by the Federal Constitution.' Senn v. Tile Layers Union, 301 U.S. 468–478, 57 S.Ct. 857, 862, 81 L.Ed. 1229."

In Bakery and Pastry Drivers and Helpers Local v. Wohl and Platzman, 62 S.Ct. 816, 817, 86 L.Ed. 1178, decided by the Supreme Court of the United States, without dissent, on March 30, 1942 (according to the facts alleged), the respondents Wohl and Platzman are, and for many years had been, peddlers of baked goods. They buy from bakeries and sell and deliver to small retailers and keep the difference between cost and selling price as their remuneration. They work seven days a week. These particular peddlers were asked to join the union, but neither joined. They were then asked to work only six days a week and employ an unemployed union member one day a week.

When Wohl and Platzman finally refused either to join the union or to employ a union relief man and continued to work seven days each week the union took measures which led to this litigation. The union caused two pickets to walk in the vicinity of the bakery which sold produce to Wohl and Platzman, each carrying a placard, one bearing the name of Wohl and the other of Platzman, and under each name appeared the following statement:

"A bakery route driver works seven days a week. We ask employment for a union relief man for one day. Help us spread employment and maintain a union wage, hours and conditions. Bakery and Pastry Drivers and Helpers Local 802, I.B. of T. Affiliated with A.F.L."

The trial court found itself constrained to hold that no labor dispute was involved, and seemed to be of the impression that therefore no constitutional right was involved. It concluded as a matter of law that the respondents "are the sole persons required to run their business". and "therefore they are not subject to picketing by a union or by the defendants who seek to compel them to employ union labor." The trial court refused the petitioners' request for a finding that "it was lawful for the defendants to truthfully advise the public of its cause, whether in the vicinity of the places of business of the bakers who sold to the plaintiffs or otherwise." Likewise it refused a request to find "that it was a constitutional right of the defendants to advise the public accurately and truthfully and without violence or a breach of the peace, that defendants worked seven days a week and that the defendants were seeking to secure employment from the plaintiffs for unemployed members of the union one day a week."

Here, Mr. Justice Frankfurter, again speaking for the court said: "One need not be in a 'labor dispute' as defined by state law to have a right under the Fourteenth Amendment to express a grievance in a labor matter by publication unattended by violence, coercion or conditions otherwise unlawful or oppressive * * *. We ourselves can perceive no substantive evil of such magnitude as to mark the limit to the right of free speech which petitioners sought to exercise. The record in this case does not contain the slightest suggestion of embarrassment in the task of governance; there are no findings and no circumstances from which we can draw the inference that the publication was attended or likely to be attended by violence, force or coercion, or conduct otherwise unlawful or oppressive; and it is not indicated that there was an actual or threatened abuse of the right of free speech through the use of excessive picketing."

Mr. Justice Douglas, in his concurring opinion in this case, even more pointedly observes:

"If the opinion in this case means that a State can prohibit picketing when it is effective but may not prohibit it when it is ineffective, then I think we have made a basic departure from Thornhill v. Alabama, 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093. We held in that case that 'the dissemination of information concerning the facts of a labor dispute must be regarded as within that area of free discussion that is guaranteed by the Constitution.' Page 102 of 310 U.S., page 744 of 60 S.Ct., 84 L.Ed. 1093. While we recognize that picketing could be regulated, we stated at pages 104, 105 of 310 U.S. at page 745 of 60 S.Ct., 84 L.Ed. 1093: 'Abridgment of the liberty of such discussion can be justified only where the clear danger of substantive evils arises under circumstances affording no opportunity to test the merits of ideas by competition for acceptance in the market of public opinion.' And we added at page 105 of 310 U.S., at page 745 of 60 S.Ct., 84 L.Ed. 1093: 'But no clear and present danger of destruction of life or property, or invasion of the right of privacy, or breach of the peace can be thought to be inherent in the activities of every person who approaches the premises of an employer and publicizes the facts of a labor dispute involving the latter.' For that reason we invoked the test, employed in comparable situations, (Cantwell v. Connecticut, 310 U. S. 296–307, 60 S.Ct. 900, 904, 84 L.Ed. 1213, 128 A.L.R. 1352; Bridges v. California, 314 U.S. 252, 62 S.Ct. [190], 192, 86 L.Ed. 192) that the statute which is the source of the restriction on free speech must be 'narrowly drawn to cover the precise situation giving rise to the danger.' Page 105 of 310 U.S., page 746 of 60 S.Ct., 84 L.Ed. 1093.

"We recognized that picketing might have a coercive effect: 'It may be that effective exercise of the means of advancing public knowledge may persuade some of those reached to refrain from entering into advantageous relations with the business establishment which is the scene of the dispute. Every expression of opinion on matters that are important has the . potentiality of inducing action in the interests of one rather than another group in society.'

page 104, of 310 U.S., page 745 of 60 S.Ct., 84 L.Ed. 1093. * * *

"But since 'dissemination of information concerning the facts of a labor dispute' is constitutionally protected, a State is not free to define 'labor dispute' so narrowly as to accomplish indirectly what it may not accomplish directly."

Mr. Justice Black and Mr. Justice Murphy joined in this concurring opinion.

A number of our state courts of last resort have also similarly decided, among which are McKay v. Retail Auto Salesmen's Local Union, 16 Cal.2d 311, 106 P.2d 373; People v. Harris, 104 Colo. 386, 91 P.2d 989; O'Neil v. Building Service Employees International Union, 9 Wash. 2d 507, 115 P.2d 662, 137 A.L.R. 1102.

The case of In re.Lyons, 27 Cal.App.2d 293, 81 P.2d 190, 193, treats of an almost identical situation.

In that case Rowlinson and Odom were copartners in a grocery store and vegetable market run as "Riverview Drive-in Market." They operated their store themselves, except with the help of an occasional employee. They rented space in their market to the Dalys, who there conducted a retail meat market without any employees. Neither Rowlinson and Odom nor Daly and Daly had any agreement with organized labor. They had no dispute nor difference with organized labor concerning wages, hours, conditions of employment, unionization of employees, employing nonunion labor, or any other matter that usually gives rise to labor troubles or differences. The only controversy was over the closing of their places of business on Sunday. Both firms kept their places of business open seven days a week. They were approached by representatives of the labor unions who requested them to close their places of business and to sign a contract to keep them closed from 12 o'clock midnight on each Saturday night to 12 o'clock midnight on each Sunday night. The shopkeepers refused to sign such an agreement but opened for business on the following Sunday morning. Shortly after they

opened a picket or pickets appeared bearing placards upon which appeared the words "Unfair" and "Unfair to organized labor", and "Unfair to organized labor Local Number 193." There is no showing that the pickets did or said anything to anybody other than to silently bear the placards. They did not attempt to otherwise interfere with the shopkeepers, their businesses or customers or with anyone entering or leaving the premises.

The shopkeepers sought to enjoin the unions, their officers, agents, employees and members from continuing the picketing and to recover damages, both actual and punitive.

Passing on that situation the Supreme Court of California held: "In this state the right to peacefully picket rests upon the constitutional guaranty of the right of free speech. We cannot see how the right to peacefully picket, under the guaranty of free speech, could be confined to cases in which there exists a dispute between an employer and organized labor over hours or conditions of employment, rate of pay, unionization of employees or employment of non-union men and not extended to a dispute between a business man and any citizen or group of citizens who may differ with him on a question of business policy. The guaranty of the right of free speech is general and extends to every class or group of citizens. * * * Citizens have just as much and no less right to differ on the wisdom of Sunday closing as they have to entertain different opinions on conditions of employment or rates of pay. The exact method used in conveying these opinions to the public is unimportant provided they are peacefully and quietly done in an orderly manner and not in violation of the provisions of a statute or an ordinance," so long as such actions are not accompanied by threats, coercion or intimidation.

That is our case almost exactly. The plaintiffs here operate a delicatessen after 5 o'clock P.M., which is the closing time of the businesses employing the defendant union members. In seeking to induce the plaintiffs to close

their business at 5 P.M. the defendants, after plaintiffs had refused their request so to do, told the plaintiffs that they would, and did, picket their store, run so-called "unfair" ads against them in the newspaper; and cause, by their picketing, union transport workers to refuse to haul merchandise to their place. All of this however was done without violence and without threat of physical intimidation or violence. In doing so the defendants were doing no more than they had a legal right to do and were clearly within their rights, under the decisions in the cases cited and reviewed, particularly those of the United States Supreme Court in the Swing case, the Thornhill case, and under the latest pronouncement of the Supreme Court of the United States in the Wohl case, and are not liable for damages for so doing.

The demurrer of the defendants is therefore sustained, and it is so ordered.